## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **BRECEK & YOUNG ADVISORS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 09-2516-JAR** |
| | ) | |
| **LLOYDS OF LONDON** | ) | |
| **SYNDICATE 2003,** | ) | |
| | ) | |
| **Defendant.** | ) | |
|                       | ) | |

## MEMORANDUM AND ORDER

Plaintiff Brecek & Young Advisors, Inc. ("BYA") filed its Complaint for Declaratory Relief and Damages seeking a judicial declaration concerning defendant Lloyds of London Syndicate 2003's ("Lloyds") contractual obligations under a policy of insurance issued by Lloyds to BYA and seeking damages for alleged breaches of that insurance contract by Lloyds. This matter is before the Court on the parties' cross-motions for summary judgment (Docs. 68, 71).  BYA has also filed a Motion to Strike as untimely (Doc. 84) Lloyds' reply brief in support of its motion for summary judgment.  For the reasons explained in detail below, the Court grants BYA's motions and denies Lloyds' motion, and directs supplemental briefing on the issue of Lloyds' putative relation back defense.

## I.     Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law."[1]

---

[1] Fed. R. Civ. P. 56(a).

In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[3]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[4]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[5]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[6]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[7]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[8]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a

---

[2]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[3]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)).

[4]*Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[5]*Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[6]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler,* 144 F.3d at 671).

[7]*Anderson*, 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[8]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

rational trier of fact could find for the nonmovant."[9]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[10]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[11]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[12] " "Where, as here, the parties file cross-motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[13]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[15]

---

[9]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[10]*Adams*, 233 F.3d at 1246.

[11]Fed. R. Civ. P. 56(c)(4).

[12]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[13]*James Barlow Family Ltd. P'ship v. David M Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

[14]*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)(quoting Fed. R. Civ. P. 1).

[15]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

## II.     Motion to Strike

Both BYA and Lloyds filed their respective Motions for Summary Judgment on November 9, 2010, and each timely responded on November 30, 2010.  BYA timely filed its reply memorandum on December 14, 2010, but Lloyds did not file its reply memorandum until December 22, 2010, twenty-two days after BYA's response was filed.  BYA asks that Lloyds' reply be stricken as untimely, as the reply deadline is fourteen days after service of the response. Lloyds responds that the Court should find excusable neglect and allow the untimely-filed reply because counsel relied upon the 23-day reply deadline set forth in a previous version of the local rules for this District.

Under D. Kan. Rule 6.1(a):

> All motions for an extension of time to perform an act required or allowed to be done within a specified time must show:
>
> (1) whether there has been prior consultation with other parties and the views of other parties;
>
> (2) the date when the act was first due;
>
> (3) if prior extensions have been granted, the number of extensions granted and the date of expiration of the last extension; and
>
> (4) the cause for the requested extension.
>
> Parties must file the motion before the specified time expires. Absent a showing of excusable neglect, the court will not grant extensions requested after the specified time expires.

Excusable neglect is a somewhat elastic concept and is not limited strictly to omissions

caused by circumstances beyond the control of the movant.[16]  The determination of whether

neglect is excusable "is at bottom an equitable one, taking account of all relevant circumstances

surrounding the party's omission," including "the danger of prejudice to the [opposing party],

the length of the delay and its potential impact on judicial proceedings, the reason for the delay,

including whether it was within the reasonable control of the movant, and whether the movant

acted in good faith."[17]  Perhaps the single most important factor in determining whether neglect

is excusable is fault in the delay.[18]  Whether the moving party's underlying claim is meritorious

should also be taken into consideration.[19]  Further, "[a] court may take into account whether the

mistake was a single unintentional incident (as opposed to a pattern of deliberate dilatoriness and

delay), and whether the attorney attempted to correct his action promptly after discovering the

mistake."[20]  "'[A] mistake . . . could occur in any [attorney's] office, no matter how well run.'"[21]

Taking into account all of these factors, the Court finds no showing of any prejudice to

BYA from the delay.  The length of the delay is approximately one week, and there is no

indication that it will disrupt the judicial proceedings, as trial is not set until May 2011.  The

Court finds no suggestion that Lloyds acted in bad faith.  The reason for the delay, however,

weighs heavily against Lloyds.  As previously noted, the Tenth Circuit has found that "fault in

---

[16]*Pioneer Inv. Servs. Co. v. Brunswick Assocs. L.P.*, 507 U.S. 380, 391–92 (1993).

[17]*Id.* at 395; *see also Bishop v. Corsentino*, 371 F.3d 1203, 1206-07 (10th Cir. 2004).

[18]*Jennings v. Rivers*, 394 F.3d 850, 856 n.5 (10th Cir. 2005) (citing *United States v. Torres*, 372 F.3d 1159, 1163 (10th Cir. 2004)).

[19]*Id.* at 857 (citing *Cessna Fin. Corp. v. Bielenberg Masonry Contracting, Inc.*, 715 F.2d 1442, 1444–45 (10th Cir. 1983)).

[20]*Id.* (citing *Hancock v. Okla. City*, 857 F.2d 1394, 1396 (10th Cir. 1988)).

[21]*Id.* (quoting *Hancock*, 857 F.2d at 1396).

the delay remains a very important factor—perhaps the most important single factor—in determining whether neglect is excusable."[22]  Lloyds' reason for failing to file a timely reply to the summary judgment motion is counsel's mistake in construing the rules; specifically, counsel admits that he relied on the "most recent edition of West's Kansas Court Rules and Procedure, Federal, and such reliance on the outdated rule should be considered excusable neglect.

 "[I]t is well established that inadvertence, ignorance of the rules, and mistakes construing the rules do not constitute excusable neglect for the purposes of Rule 6(b)."[23]  It is counsel's responsibility to keep current on the Court's local rules.  The most current local rules are provided, free of charge, on the Court's website and were provided in the West Supplement. The rules were amended over three months prior to their effective date, providing ample time for the bar to adjust to the new deadlines, a longer period of adjustment than the effective date of the Federal Rules, which was December 1, 2009.  This is the quintessential example of an attorney who is simply ignorant of the rules applicable to him, a circumstance that does not constitute excusable neglect.  Counsel's reliance on an outdated West publication, rather than the Court's published local rules, does not change the excusable neglect analysis.[24]

The Court notes that its interest in judicial economy does not dictate a contrary result. Here, the cross-motions for summary judgment motions were filed and responded to.  BYA did not set forth a statement of additional facts in its response to Lloyds' motion, so the lack of reply does not allow the Court to deem any factual contentions by plaintiff as uncontroverted.  The

---

[22]*City of Chanute v. Williams Natural Gas Co.*, 31 F.3d 1041, 1046 (10th Cir. 1994).

[23]*Quigley v. Rosenthal*, 427 F.3d 1232, 1238 (10th Cir. 2005).

[24]*See Walls v. MiraCorp, Inc.*, No. 09-2112-JAR, Doc. 75 (D. Kan. Aug. 19, 2010) (declining to find excusable neglect under similar circumstances where counsel relied on outdated rule book).

Court finds that the issues before it are sufficiently briefed to allow it to render a decision. Accordingly, BYA's motion to strike Lloyds' reply is granted.

## III.  Uncontroverted Facts

### *The Policy*

Lloyds issued to BYA as the named insured a "Broker/Dealer and Registered Representatives Professional Liability Policy," effective December 31, 2006 through December 31, 2007 ("the Policy").  The Policy has limits of $2 million "Each Claim" and in the aggregate, with a $50,000 "Each Claim" Retention for Broker/Dealer insureds.  The Policy provides insurance coverage for third-party claims, stating that the insurer

> shall pay, on behalf of an insured, Damages which the Insured becomes legally obligated to pay because of a Claim that is both made against the Insured and reported to the insurer in writing during the Policy Period . . . for a Wrongful Act committed solely in the rendering or failing to render Professional Services for a Client. . . .

The Policy provides that the insurer shall have the "duty to defend any civil litigations or arbitrations against the insureds that are covered by this Policy," and that the insured shall "pay Damages and Defense Expenses up to the amount of the applicable Retention" and shall "pay all Damages and Defense Expenses incurred in each Claim that exceeds the Retention."

"Claim" is defined as

> a written demand received by any Insured for Damages (including pleadings received in a civil litigation or arbitration) for an actual or alleged Wrongful Act.

The Policy provides that "All Claims based upon or arising out of the same Wrongful Act or

Interrelated Acts shall be considered a single Claim."  "Interrelated Wrongful Acts" are defined as

> any Wrongful Acts that are: 1. similar, repeated or continuous; or 2. connected by reason of any common fact, circumstance, situation, transaction, casualty, event, decision or policy or one or more series of facts, circumstances, situations, transactions, casualties, events, decisions or policies.

"Wrongful Act" is defined as

> A negligent Act or omission . . . committed by an Insured in the rendering of Professional Services.

### The Wahl Arbitration/Underlying Litigation

BYA was sued in an arbitration proceeding styled, *Paul W. and Marie S. Wahl, et al. v. Brecek & Young Advisors, Inc.*, NASD Case No. 07-0515, filed in May 2007 before the National Association of Securities Dealers, Inc. ("the Wahl Arbitration").  The individual respondents served at various times as investment advisors, insurance agents and securities salesmen. Claimants Paul and Marie Wahl alleged, among other things, that they were damaged by the individual respondents' selling them unsuitable products while acting as a team, and "flipping" or "churning" annuities, and that BYA was liable for this misconduct under the theory of *respondeat superior*, as well as for failing to adequately supervise the brokers/agents. Specifically, the Wahls alleged that between 1999 and 2005, respondents induced the Wahls to surrender an IDS variable life insurance policy in exchange for a new policy with an initial premium payment of $30,233 and a face value of $250,000, and that the Wahls could not afford to maintain the policy and were forced to surrender it; induced them to purchase an adjustable

premium life insurance policy with a $100,000 face value with an initial surrender cost of $10,687.50; sold the Wahls an additional life insurance policy valued at $500,000 with an initial premium of $9,750; misrepresented to the Wahls that they would not have to make additional premium payments on the $500,000 policy; sold four annuities to the Wahls, who were sixty-eight and sixty-four years of age respectively, over a four month period; and flipped those annuities repeatedly for the purpose of obtaining brokerage commissions.[25]

### Additional Claims

In November 2007, twenty-five additional individuals or couples filed claims against BYA, using the same counsel the Wahls had retained, and joining in the Wahl Arbitration. These additional claimants collectively alleged that B & G employed a business model in which all of its representatives worked as a team; that they were targeted because they were retired or nearing retirement age; that B & G agents sold them products that were unsuitable; that the agents engaged in churning and used the same or similar misrepresentations and omissions with respect to each claimant; that B & G referred many claimants to Baxter or Balser, who subjected claimants' funds to unsuitable market timing strategies; and that all of the transactions and occurrences took place during the same six-year time span.[26]

---

[25]Plaintiff's Ex. B.

[26]Plaintiff's Ex. C at 8-9.

### Motion to Sever

BYA filed a Motion to Sever the claims, arguing that claimants alleged various, unrelated purchases of over thirty annuity or insurance products, and that the claims did not involve common questions of law or fact or arose from the same transaction or occurrence or same series of transactions or occurrences. Claimants opposed the motion, and asserted that their claims were properly consolidated because of multiple similarities and common facts. The Arbitration Panel issued an Order Denying Motion to Sever.

### The Coverage Claim

The Wahl Arbitration falls within the definition of a Claim under the Policy and Lloyds agreed to defend BYA subject to a reservation of rights. BYA complied with the notice provisions contained in the Policy and Lloyds has not raised late or improper notice as a defense to coverage. By letter dated August 9, 2007, Lloyds notified BYA that it would defend BYA in the Wahl Arbitration subject to certain reservations of rights under the Policy. By letter dated October 29, 2007, Lloyds notified BYA that it had tendered the complaint in the Wahl Arbitration to another insurer of BYA's to "evaluate whether the Complaint is interrelated to [an earlier lawsuit]. Then, by letter dated December 12, 2007, Lloyds notified BYA that "the policy will consider all claims based upon or arising out of the same Wrongful Act or Interrelated Wrongful Acts as one claim." Lloyds further states that "[w]hile each of the [Wahl] claimants alleged generally that they were given poor investment advice and/or that their accounts were churned by repeatedly swapping annuities, each set of claimants is unrelated to the others and was provided individual advice and service by one or more of the respondents." Because Lloyds determined that the Wahl Arbitration claims did not arise out of the same or Interrelated

Wrongful Acts, it informed BYA that it would not consider the Wahl Arbitration claims a single Claim and instead each claim would be subject to a separate $50,000 retention.   The December 12 letter incorporated the previous two letters reserving Lloyds reservation of rights under the Policy.

By letter dated October 20, 2008, BYA disagreed with Lloyds' analysis of coverage under the Policy regarding the Wahl Arbitration and, specifically, Lloyds' construction of the term "Interrelated Wrongful Acts" as applied to the claims asserted against BYA in the Wahl Arbitration.  BYA contended that under the Policy's definition of "Interrelated Wrongful Acts," the Wahl Arbitration claims must be deemed a single claim subject to a single $50,000 "Each Claim" retention because the claims are "similar" or "connected by reason of any common fact, circumstance, situation, transaction, casualty, event, decision or policy. . . ."

### Settlement of the Wahl Arbitration

On or about March 3, 2009, BYA entered into Mutual Release and Settlement Agreements with the claimants in the Wahl Arbitration, releasing all claims asserted by all claimants against BYA.  The total amount paid to claimants in settlement of the Wahl Arbitration is $1,053,749.99.  BYA's portion of the settlement payment was $699,092.21, paid on March 27, 2009.  BYA has satisfied the $50,000 "Each Claim" retention under the Policy. BYA paid an additional $312,787.38 out-of-pocket for fees and expenses related to the defense of the Wahl Arbitration.  The total defense and indemnity incurred by BYA is $1,366,537.37. Lloyds pro-rated the defense costs, attributing them equally to each of the twenty-six claims or sets of claims.  Lloyds then paid only that portion of each claim in excess of the $50,000 "Each Claim" retention for a total payment of $384,657.79.  After deducting the $50,000 "Each Claim"

retention and the $384,657.79 previously paid by Lloyds, the net amount incurred and paid by

BYA in defense and settlement of the Wahl Arbitration is $931,879.58.

## IV. Discussion

 BYA seeks summary judgment in its favor declaring that Lloyds is obligated to pay in

full the expenditures made by BYA for defense and indemnity in excess of the $50,000 "Each

Claim" retention because the claims brought in Wahl Arbitration arise out of "Interrelated

Wrongful Acts," as defined by the Policy, such that a single $50,000 retention applies.

Conversely, Lloyds argues that the terms of the Policy require the application of separate "Each

Claim" retentions to each of the twenty-six claims asserted against BYA in the Wahl Arbitration,

and moves for summary judgment in its favor.

### A.  Interpretation of Insurance Contracts Under New York Law

The parties agree that, per the express terms of the Policy, New York law applies to the

resolution of the pending motions.  Under New York law, the interpretation of a contract "is a

matter of law for the court to decide."[27]  Summary judgment may be granted where the words of

a contract convey a definite and precise meaning without ambiguity.[28]

In deciding how to interpret an insurance contract, a court undertakes a three-part

analysis.  First, the court must determine "whether the contract is unambiguous with respect to

the question disputed by the parties."[29]  If the Court determines that a contract is not ambiguous,

---

[27]*Seneca Ins. Co. v. Kemper Ins. Co.*, No. 02 Civ. 10088, 2004 WL 1145830, at *4 (S.D.N.Y. May 21, 2004), *aff'd* 133 F. App'x 770 (2d Cir. 2005) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)).

[28]*Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 424, 428 (2d Cir. 1992).

[29]*Int'l Multifoods Corp.*, 309 F.3d at 83.

it "'should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence' and . . . may then award summary judgment."[30]  An insurance contract is ambiguous where its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."[31]  "The language of a contract is not made ambiguous simply because the parties urge different interpretations."[32]  Second, if "a court concludes that an insurance provision is ambiguous, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract."[33]  Third, "[i]f the extrinsic evidence does not yield a conclusive answer as to the parties' intent, [the] court may apply other rules of contract construction, including the rule of *contra proferentem*, which generally provides that where an insurer drafts a policy any ambiguity in [the] . . . policy should be resolved in favor of the insured."[34]

Where insurance contracts contain an exclusion provision, as does the Policy in this case, "'[t]he insurer generally bears the burden of proving that the claim falls within the scope of the exclusion . . . [by] establish[ing] that the exclusion is stated in clear and unmistakable language,

---

[30]*Id*. (quoting *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998)).

[31]*Id*. (citation and internal quotation marks omitted).

[32]*Seiden*, 959 F.2d at 428.

[33]*Morgan Stanley Group Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275-76 (2d Cir. 2000) (citation and internal quotation marks omitted).

[34]*Id*. at 276 (citation and internal quotation marks omitted).

is subject to no other reasonable interpretation, and applies in the particular case.'"[35]

## B.      Interrelated Wrongful Acts

Before turning to the issue central to the pending motions, the Court addresses Lloyds'

argument that BYA is barred from taking its present position that the claims were not based on

Interrelated Wrongful Acts because it made a "judicial admission" in the Wahl Arbitration by

virtue of its unsuccessful motion to sever the Wahl claimants into separate arbitrations.  Judicial

admissions are "formal, deliberate declarations which a party or his attorney makes in a judicial

proceeding for the purpose of dispensing with proof of formal matters or of facts about which

there is no real dispute."[36]  BYA's motion to sever centered on the legal question of whether

joinder was permitted under Rule 12312 of the NASD Customer Code of Arbitration

Procedure,[37] which resembles the standard for permissive joinder of parties under Fed. R. Civ. P.

20.[38]  Because the matter Lloyds claims was admitted is a proposition of law, the doctrine is not

---

[35]*Quanta Lines Ins. Co. v. Inv. Capital Corp.*, No. 06 Civ. 4624(PKL), 2009 WL 4884096, at *9 (S.D.N.Y. Dec. 17, 2009) (quoting *Vill. of Sylvan Beach v. Travelers Indem. Co.*, 55 F.3d 114, 115-16 (2d Cir. 1995)).

[36]*Falcon v. Saint-Veltri*, 23 F. App'x 908, 912 n.3 (10th Cir. 2001) (quotation omitted).

[37]Rule 12312(a), entitled "Multiple Claimants," states:

> One or more parties may join multiple claims together in the same arbitration if the claims contain common questions of law or fact and
>
> •       The claims assert any right to relief jointly or severally; or
>
> •       The claims arise out of the same transaction or occurrence, or a series of transactions or occurrences.

[38]Fed. R. Civ. P. 20 states in relevant part:

> All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action.  All persons . . . may be joined in one action as defendants if there is asserted against

applicable.[39]  Moreover, judicial admissions must be "deliberate and clear."[40]  By arguing for severance under the procedural rules of an arbitration forum, there is no indication that BYA was making any deliberate admission of fact as to the existence or nonexistence of any "Interrelated Wrongful Acts" under the Policy, which was not at issue in the arbitration, and to which Lloyds was not a party.

Lloyds also argues that BYA should not be able to "mend its hold" by arguing to this Court that the twenty-six Wahl Arbitration claims are interrelated after having affirmatively represented to one judicial body that the underlying claims were unrelated.  The so-called "mend the hold" doctrine is a corollary of the duty of good faith imposed on the parties to a contract and prohibits a party who "hokes up a phony defense to the performance of his contractual duties and then when that defense fails (at some expense to the other party) tries on another defense for size."[41]  In this case, however, it is Lloyds that is allegedly in breach of the parties' insurance contract, not BYA, who has not changed its position in this action against Lloyds.  BYA has consistently plead and pursued the theory that it is entitled to additional coverage in this case based on the definition of Interrelated Wrongful Acts.

---

them jointly, severally, or in the alternative any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action.  A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded.

[39]*See Harrington v. City of Nashua*, 610 F.3d 24, 31 (1st Cir. 2010) ("legal conclusions are rarely considered to be binding judicial admissions") (internal quotation omitted); *In re Teleglobe Comm. Corp.*, 493 F.3d 345, 377 (3d Cir. 2007) (judicial admissions "must be statement of fact that require evidentiary proof, not statements of legal theories").

[40]*Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007).

[41]*Harbor Ins. Co. v. Cont'l Bank Corp.*, 922 F.2d 357, 363 (7th Cir. 1990) (citation omitted).

As BYA correctly posits, Lloyds' argument seeking to preclude BYA's position in this lawsuit is more properly analyzed under the doctrine of judicial estoppel, which is based upon protecting the integrity of the judicial system by "prohibiting parties from deliberately changing positions according to the exigencies of the moment."[42] While there is no precise formula for application of the doctrine, courts typically inquire as to whether: 1) a party's later position is clearly inconsistent with its earlier position; 2) a party has persuaded a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or second court was misled"; and 3) the party seeking to assert the inconsistent position would derive an unfair advantage if not estopped.[43] "Because of the harsh results attendant with precluding a party from asserting a position that would normally be available to the party, judicial estoppel must be applied with caution."[44] Here, BYA's argument for severance was not persuasive, as its motion to sever was denied, its position regarding coverage has remained consistent, and there is no resulting unfair advantage. Accordingly, the Court finds that the doctrine of judicial estoppel does not apply.

Having determined that BYA is not barred from asserting its position, the Court turns to the issue at hand. There is no dispute that the Wahl Arbitration constitutes a Claim under the Policy, and neither party argues that "Interrelated Wrongful Acts" is ambiguous. As the insured, BYA argues that the claims are logically interrelated by a common factual nexus with the

---

[42]*Bradford v. Wiggins*, 516 F.3d 1189, 1194 (10th Cir. 2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001)).

[43]*Id.* (citing *Johnson v. Lindon City Corp.*, 405 F.3d 1065 (10th Cir. 2005) (citing *New Hampshire*, 532 U.S. at 750).

[44]*Id.* (quoting *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996)).

wrongful acts alleged in each of the twenty-six claims. Accordingly, BYA contends that all twenty-six claims should be treated as a single claim under the Policy definition of that term, and thus subject to a single $50,000 "Each Claim" retention.

Lloyds denies the existence of a "sufficient factual nexus" between the twenty-six claims and that the wrongful acts underlying those claims are interrelated within the meaning of the Policy. Lloyds offers a side-by side comparison of the claims, pointing out that 1) the underlying claims involved twenty different groups of investors, who purchased in total, at least thirty different types of annuities and/or variable life insurance policies from at least fourteen separate and different issuers; 2) the underlying claimants alleged that each of them dealt with one or more of seven different registered representatives, who misrepresented the characteristics of various products; and 3) the underlying claimants each had their own accounts and each sought recovery of the losses in those specific accounts and did not assert any right to relief jointly or severally.

To establish that Claims in this case are interrelated, they must share a "sufficient factual nexus."[45] Cases interpreting comparable policy language consider, among other factors, whether the "wrongful acts" are contemporaneous, and whether there is a common scheme or plan underlying the acts.[46] "This approach does not require exact factual overlap, or even identical legal causes of action, but rather focuses simply on whether the claims are logically linked by a

---

[45]*Quanta Lines Ins. Co. v. Inv. Capital Corp.*, No. 06 Civ. 4624(PKL), 2009 WL 4884096, at *14 (S.D.N.Y. Dec. 17, 2009) (collecting cases).

[46]*See Capital Growth Fin. LLC v. Quanta Specialty Lines Ins. Co.*, No. 07-80908-CIV, 2008 WL 2949492, at *4 (S.D. Fla. July 30, 2008) (collecting cases).

'sufficient factual nexus.'"[47]  A sufficient factual nexus exists where the claims "are neither factually nor legally distinct, but instead arise from common facts" and where the "logically connected facts and circumstances demonstrate a factual nexus" among the claims.[48]  Claims share a sufficient factual nexus when they are "based on the same agreement" or when they involve the "same underlying circumstance."[49]  "The mere fact that claims are joined together in a suit does not establish a sufficient factual nexus between the claims."[50]  "[T]he concept of 'claim' is distinct from that of 'suit,' and neither the initial amalgamation of claims in one suit nor the variety of procedural metamorphoses which a suit often undergoes . . . alters the distinctive nature of individual claims or the consequent loss potentially incurred therefrom."[51] The court "evaluates an inclusion based on the underlying facts rather than the legal theories pleaded or additional defendants named."[52]

　　Applying this standard to the Policy's broad definition of "Interrelated Wrongful Acts," the Court concludes that there is a sufficient factual nexus between the Wrongful Acts from which the Wahl Arbitration Claims arise to justify their classification as Interrelated Wrongful

---

[47]*Id.* (citing *Zahler v. Twin City Fire Ins. Co.*, No. 04 Civ 10299 (LAP), 2006 WL 846352 (S.D.N.Y. Mar. 31, 2006) (finding interrelation even where underlying claims were substantively distinct claims for securities fraud and breach of fiduciary duty); *Zunenshine v. Exec. Risk Indemnity, Inc.*, No. 97 Civ. 5525(MBM), 1998 WL 483475 (S.D.N.Y. Aug. 17, 1998) (finding interrelation between negligent misrepresentation and securities fraud claims involving distinct communication mediums involving private and public disclosures)).

[48]*Id.* (quoting *Seneca Ins. Co. v. Kemper Ins. Co.*, No 02 Civ. 10088, 2004 WL 1145830, at *9 (S.D.N.Y. May 21, 2004), *aff'd* 133 F. App'x 770 (2d Cir. 2005)).

[49]*Home Ins. Co. v. Spectrum Info. Tech., Inc.*, 930 F. Supp. 825, 850 (E.D.N.Y. 1996).

[50]*Seneca Ins. Co.*, 2004 WL 1145830, at *7.

[51]*Id.* (quoting *Home Ins. Co.*, 930 F. Supp. at 850).

[52]*Id.*

Acts.  Here, every claimant alleged that the broker-dealers were responsible for abuses committed in the course and scope of their agency.  Each of the Wahl claimants alleged they were damaged by individual broker/agents in the same Ohio office selling them unsuitable investment products, and "flipping" or "churning" their annuities.  Claimants all specifically alleged that BYA utilized a business model in which "all of its representatives worked together as a team with respect to each customer—i.e., all [BYA] agent/brokers shared equal responsibility for servicing each claimant's investment needs and a Claimant might meet with one or <u>all</u> of the individual Respondents."[53]  All of the claimants alleged that BYA failed to properly supervise the team of agents and failed to diligently review their transactions and sales, thereby allowing the improper frequent exchange and sales of unsuitable products to occur.  Moreover, all of the claimants did business with respondents during the same general time period and almost all were of retirement age.  The Court disagrees with Lloyds that the unique financial position of each claimant is sufficient to show as a matter of law that the claims could not be interrelated, as "wrongful acts may be 'interrelated' even where they do not uniformly translate in to a common liability thread."[54]  Accordingly, the Court determines that these logically connected facts and circumstances demonstrate a factual nexus between the twenty-six claims sufficient to justify the conclusion that they arise from Interrelated Wrongful Acts.  BYA is granted summary judgment on this ground.

## C.      Relation Back Defense

---

[53]Pl. Ex. F at 9-10.

[54]*Capital Growth Fin. LLC v. Quanta Specialty Lines Ins. Co.*, No. 07-80908-CIV, 2008 WL 2949492, at *5 (S.D. Fla. July 30, 2008).

Lloyds states in a footnote in its Motion for Summary Judgment that if the underlying claims are found to have arisen from Interrelated Wrongful Acts, then all of the claims should relate back to a time preceding the Policy Period, meaning there would be no coverage for any of the claims.[55] Lloyds notes that this issue is the center of a pending discovery dispute between the parties, in which Lloyd seeks information concerning claims that arose prior to the commencement of the Policy Period because, if the twenty-six claims are interrelated, those claims are by definition interrelated to <u>any</u> claims involving the sale of unsuitable securities that arose prior to the commencement Policy Period.[56] Lloyds states that it would address this issue further in its reply brief, once the motion to compel is decided.[57]

BYA raised this issue in its motion for summary judgment as well, arguing that since Lloyds did not identify this defense in its reservation of rights letter, it is deemed waived as a matter of law. Alternatively, even if Lloyds had not waived this defense, BYA argues that it should not be allowed to assert defenses it failed to raise in its Answer, and is estopped from doing so at this late date. Lloyds responds that it preserved its defense in its October 29, 2007 supplement to its August 9, 2007 reservation of rights letter to BYA and properly asserted the defense in the Pretrial Order.

On February 25, 2011, Magistrate Judge Rushfelt granted Lloyds' motion to compel discovery, and overruled BYA's objections on relevancy grounds, noting the reservation of

---

[55](Doc. 72 at n.1.)

[56]*Id.*

[57]*Id.* Even if Lloyds' reply brief had not been stricken as untimely, the Magistrate Judge did not issue an order granting the motion to compel until February 25, 2011, long after the reply was due.

rights letter and the Pretrial Order, in which Lloyds asserts the relation back defense as well as designates a factual issue regarding that defense.[58]  Magistrate Judge Rushfelt held that these issues remain relevant for discovery to determine when the first Interrelated Wrongful Act occurred, "because the [P]olicy may not afford coverage if Plaintiff had knowledge or reasonable basis upon which to anticipate that the Wrongful Act or any Interrelated Wrongful Act could result in a claim."[59]  The court ordered BYA to respond and produce all documents responsive to Lloyds' Request for Production No. 2 within thirty days of the Order.[60]

BYA did not file an objection to the Magistrate Judge's order,[61] and thus must comply on or before March 28, 2011.  Accordingly, the Court shall permit Lloyds to submit supplemental briefing on the relation back defense within thirty (30) days of production of discovery, with regular response and reply deadlines to follow.[62]  This case shall be removed from the May 9, 2011 trial calendar, and will be rescheduled if necessary, after the Court rules on any further motion filed by Lloyds.  If no further summary judgment motion is filed, judgment shall be entered for BYA in accordance with the findings in this Order.

**IT IS THEREFORE ORDERED BY THE COURT** that BYA's Motion to Strike (Doc. 84) is GRANTED;

**IT IS FURTHER ORDERED** that BYA's Motion for Summary Judgment (Doc. 68) is

---

[58]*See* Doc. 88 at 7-9 (citing Pretrial Order, Doc. 79 at §§ 7.a.6 and 8.b.).

[59]*Id*. at 8.

[60]*Id*. at 9.

[61]*See* Fed. R. Civ. P. 72(a) (a party may file objections to a non-dispositive order issued by a Magistrate Judge within 14 days after being served with a copy).

[62]*See* D. Kan. R. 6.1(d)(2).

GRANTED and Lloyds' Motion for Summary Judgment (Doc. 71) is DENIED;

**IT IS FURTHER ORDERED** that Lloyds shall be permitted to submit supplemental briefing on the relation back defense within thirty (30) days of production of discovery as ordered by the Magistrate Judge; BYA's response and Lloyds' reply brief, if any, shall be filed within the deadlines set forth in D. Kan. Rule 6.1(d)(2). If Lloyds does not pursue this defense, judgment shall be entered in favor of BYA in accordance with the findings in this Order.

**IT IS SO ORDERED.**

**Dated: March 21, 2011**

                                         **S/ Julie A. Robinson**

                                         **JULIE A. ROBINSON**

                                         **UNITED STATES DISTRICT JUDGE**