## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| BRECEK & YOUNG ADVISORS, INC., | ) |
| | ) |
| **Plaintiff,** | ) |
| v. | )   **Case No. 09-2516-JAR** |
| | ) |
| LLOYDS OF LONDON | ) |
| SYNDICATE 2003, | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

## MEMORANDUM AND ORDER

Plaintiff Brecek & Young Advisors, Inc. ("BYA") filed its Complaint for Declaratory
Relief and Damages seeking a judicial declaration concerning defendant Lloyds of London
Syndicate 2003's ("Lloyds") contractual obligations under a policy of insurance issued by
Lloyds to BYA and seeking damages for alleged breaches of that insurance contract by Lloyds.
The parties filed cross-motions for summary judgment (Docs. 68, 71); the Court granted BYA's
motion, denied Lloyds' motion, and permitted supplemental briefing on the issue of Lloyds'
putative relation back defense.  This matter is now before the Court on Lloyds' Supplemental
Motion for Summary Judgment (Doc. 93).  For the reasons explained in detail below, the Court
denies Lloyds' motion.

### I.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no
genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law."[1]

---

[1]Fed. R. Civ. P. 56(a).

In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[3]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[4]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[5]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[6]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[7]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[8]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a

---

[2]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[3]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)).

[4]*Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[5]*Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[6]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler,* 144 F.3d at 671).

[7]*Anderson*, 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[8]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

rational trier of fact could find for the nonmovant."[9]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[10]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[11]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[12]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[13]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."

## II.    Uncontroverted Facts

The Court adopts the extensive uncontroverted facts set forth in its previous Order and incorporates them herein by reference.  The Court will not restate its findings in detail, except as necessary to explain the Court's ruling or provide context with respect to the relation back defense presently before the Court.  The following facts are either uncontroverted or construed in

---

[9]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[10]*Adams*, 233 F.3d at 1246.

[11]Fed. R. Civ. P. 56(c)(4).

[12]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[13]*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)(quoting Fed. R. Civ. P. 1).

the light most favorable to BYA, the nonmoving party.

### *The Policy*

Lloyds issued to BYA as the named insured a "Broker/Dealer and Registered Representatives Professional Liability Policy," effective December 31, 2006 through December 31, 2007 ("the Policy"). The Policy has limits of $2 million on "Each Claim" and in the aggregate, with a $50,000 "Each Claim" Retention for Broker/Dealer insureds. The Policy provides insurance coverage for third-party claims, stating that the insurer

> shall pay, on behalf of an insured, Damages which the Insured becomes legally obligated to pay because of a Claim that is both made against the Insured and reported to the insurer in writing during the Policy Period . . . for a Wrongful Act committed solely in the rendering or failing to render Professional Services for a Client. . . .

The Policy provides that the insurer shall have the "duty to defend any civil litigations or arbitrations against the insureds that are covered by this Policy," and that the insured shall "pay Damages and Defense Expenses up to the amount of the applicable Retention" and shall "pay all Damages and Defense Expenses incurred in each Claim that exceeds the Retention." The Policy provides that "All Claims based upon or arising out of the same Wrongful Act or Interrelated Acts shall be considered a single Claim," and that such single claim shall be deemed to have been made on the earlier of the following: (i) when the earliest Claim arising out of such Wrongful Act or Interrelated Acts was first made, or (ii) when notice was provided to the Insurer concerning a Wrongful Act giving rise to such Claim. The Policy defines the term "Claim" as "a written demand received by any Insureds for damages (including pleadings received in a civil litigation or arbitration) for an actual or alleged Wrongful Act."

As previously discussed,  "Interrelated Wrongful Acts" are defined as

> any Wrongful Acts that are: 1. similar, repeated or continuous; or
> 2. connected by reason of any common fact, circumstance,
> situation, transaction, casualty, event, decision or policy or one or
> more series of facts, circumstances, situations, transactions,
> casualties, events, decisions or policies.

"Wrongful Act" is defined as "A negligent Act or omission . . . committed by an Insured in the rendering of Professional Services."

### The Wahl Arbitration/Underlying Litigation

BYA was sued in an arbitration proceeding styled, *Paul W. and Marie S. Wahl, et al. v. Brecek & Young Advisors, Inc.*, filed in May 2007 before the National Association of Securities Dealers, Inc. ("the Wahl Arbitration").  The individual respondents served at various times as investment advisors, insurance agents and securities salesmen.  Claimants Paul and Marie Wahl alleged, among other things, that they were damaged by the individual respondents selling them unsuitable products while acting as a team, and "flipping" or "churning" annuities, and that BYA was liable for this misconduct under the theory of *respondeat superior*, as well as for failing to adequately supervise the brokers/agents.

In November 2007, twenty-five additional individuals or couples filed claims against BYA, using the same counsel the Wahls had retained, and joined in the Wahl Arbitration.  These additional claimants collectively alleged that B & G employed a business model in which all of its representatives worked as a team; that they were targeted because they were retired or nearing retirement age; that B & G agents sold them products that were unsuitable; that the agents engaged in churning and used the same or similar misrepresentations and omissions with respect

to each claimant; that B & G referred many claimants to Baxter or Balser, who subjected

claimants' funds to unsuitable market timing strategies; and that all of the transactions and

occurrences took place during the same six-year time span.

### The Coverage Claim

The Wahl Arbitration falls within the definition of a Claim under the Policy and Lloyds

agreed to defend BYA subject to a reservation of rights.  By letter dated August 9, 2007, Lloyds

notified BYA that it would defend BYA in the Wahl Arbitration subject to certain reservations

of rights under the Policy.  The letter does not specifically reference any relation back or single

claim defense.  By letter dated October 29, 2007, Lloyds notified BYA that it had tendered the

complaint in the Wahl Arbitration to another insurer of BYA's to "evaluate whether the

Complaint is interrelated to [the Colaner Arbitration].  By email dated November 20, 2007,

Lancer informed BYA's broker that "coverage counsel for Catlin and coverage counsel for

[Fireman's Fund] have concluded that the [Colaner Arbitration and the Wahl Arbitration] claims

are not interrelated."  Then, by letter dated December 12, 2007, Lloyds notified BYA that "the

policy will consider all claims based upon or arising out of the same Wrongful Act or

Interrelated Wrongful Acts as one claim."  Lloyds further states that "[w]hile each of the [Wahl]

claimants alleged generally that they were given poor investment advice and/or that their

accounts were churned by repeatedly swapping annuities, each set of claimants is unrelated to

the others and was provided individual advice and service by one or more of the respondents."

Because Lloyds determined that the Wahl Arbitration claims did not arise out of the same or

Interrelated Wrongful Acts, it informed BYA that it would not consider the Wahl Arbitration

claims a single Claim and instead each claim would be subject to a separate $50,000 retention.

6

The December 12 letter incorporated the previous two letters reserving Lloyds' reservation of rights under the Policy.

By letter dated October 20, 2008, BYA disagreed with Lloyds' analysis of coverage under the Policy regarding the Wahl Arbitration and, specifically, Lloyds' construction of the term "Interrelated Wrongful Acts" as applied to the claims asserted against BYA in the Wahl Arbitration. BYA contended that under the Policy's definition of "Interrelated Wrongful Acts," the Wahl Arbitration claims must be deemed a single claim subject to a single $50,000 "Each Claim" retention because the claims are "similar" or "connected by reason of any common fact, circumstance, situation, transaction, casualty, event, decision or policy. . . ."

On March 22, 2011, this Court concluded that the twenty-six claims at issue in the Wahl Arbitration arose out of Interrelated Wrongful Acts and entered summary judgment in favor of BYA. The Court concluded that there was a sufficient factual nexus between the Wrongful Acts from which the Wahl Arbitration Claims arise to justify their classification as Interrelated Wrongful Acts, explaining,

> Here, every claimant alleged that the broker-dealers were responsible for abuses committed in the course and scope of their agency. Each of the Wahl claimants alleged they were damaged by individual broker/agents in the same Ohio office selling them unsuitable investment products, and "flipping" or "churning" their annuities. Claimants all specifically alleged that BYA utilized a business model in which "all of its representatives worked together as a team with respect to each customer—i.e., all [BYA] agent/brokers shared equal responsibility for servicing each claimant's investment needs and a Claimant might meet with one or <u>all</u> of the individual Respondents." All of the claimants alleged that BYA failed to properly supervise the team of agents and failed to diligently review their transactions and sales, thereby allowing the improper frequent exchange and sales of unsuitable products to occur. Moreover, all of the claimants did business with

respondents during the same general time period and almost all were of retirement age.  The Court disagrees with Lloyds that the unique financial position of each claimant is sufficient to show as a matter of law that the claims could not be interrelated, as "wrongful acts may be 'interrelated' even where they do not uniformly translate into a common liability thread."  Accordingly, the Court determines that these logically connected facts and circumstances demonstrate a factual nexus between the twenty-six claims sufficient to justify the conclusion that they arise from Interrelated Wrongful Acts.[14]

The Court also permitted Lloyds to submit supplemental briefing on the issue of whether there is no coverage for the Wahl Arbitration because it was not made and reported during the Policy Period, that is, the "relation back defense," raised for the first time in the Pretrial Order over BYA's objection.  The Court noted that this issue was the focus of a pending discovery dispute, and that BYA had taken the position that since Lloyds did not identify this defense in its reservation of rights letter, it is deemed waived as a matter of law or, alternatively, that Lloyds should not be allowed to assert defenses it failed to raise in its Answer and is estopped from doing so at this late date.  The Court directed BYA to comply with Magistrate Judge Rushfelt's Order directing it to respond to Lloyd's request for production regarding when the first Interrelated Wrongful Acts occurred.  The following facts relate to that request for production.

### The Knotts Arbitration

On or about September 22, 2005, Michael P. Knotts commenced a lawsuit in the Court of Common Pleas for Summit County, Ohio, entitled *Michael P. Knotts vs. B & G Financial Network, Inc., et al.* ("the Knotts Lawsuit").  Plaintiff alleged that B & G and Daniel Gergel convinced him to retire early from his employer, SBC, in order to obtain a lump sum settlement

---

[14]Doc. 89 at 18-19.

from his 401(k) plan totaling $474,000.  Plaintiff alleged that the defendants sold him unsuitable

annuities and churned such annuities by buying eight separate products over a period of four

years.  By letter dated November 21, 2005 and addressed to Gergel, Lancer Claims Services

("Lancer"), on behalf of Fireman's Fund Insurance Companies ("Fireman's Fund")

acknowledged receipt of the Knotts Lawsuit.  By letter dated December 16, 2006, NASD

Dispute Resolution ("NASD," n/k/a FINRA) advised BYA that it was named as a respondent in

the NASD arbitration entitled *Michael P. Knotts v. Brecek & Young Advisors, Inc., et al.* ("the

Knotts Arbitration").  BYA received notice of the Knotts Arbitration on December 22, 2006.

By letters to BYA dated December 27, 2006 and January 26, 2007, Lancer, on behalf of

Fireman's Fund, acknowledged receipt of notice of the Knotts Arbitration.  Lloyds also received

notice of the Knotts Arbitration, as evidenced by its acknowledgment and denial of the same

dated March 14, 2007.  By letter dated March 19, 2007, Lancer advised BYA that American

Automobile Insurance Company ("American"), a subsidiary of Fireman's Fund, had agreed to

defend the Knotts Arbitration subject to a reservation of rights under policy number 8-17-ME

07318221 ("the Fireman's Fund Policy").

The Knotts Arbitration was commenced against B & G, Gergel, BYA and Michael A.

Snyder, Jr.  At that time, B& G was an Ohio Corporation located at 4000 Embassy Pkwy, Suite

222, Fairlawn, Ohio, 44333.  Claimant alleged that, at all times pertinent to this matter, Gergel

was an agent or employee of B & G.  Claimant alleged that he worked for ATT/SBC

telecommunications for thirty years and was eligible for early retirement by 2001.  Claimant

alleged that he sought the advice of Gergel in the summer of 2001 regarding a $6,000 IRA

account, and that Gergel, Snyder, B & G and BYA fraudulently induced him to retire in order to

obtain a lump sum settlement from his 401(k) and pension pay out, in the amount of $474,000.

Claimant alleged that the respondents churned his account by buying several separate annuity

products, and failed to make suitable investment recommendations.  Claimant further alleged

that BYA failed to properly supervise the other respondents and is in all respects vicariously

liable for all of the other respondents' wrongful acts or failures to act.

### The Colaner Arbitration

By letter dated June 13, 2006, Robert B. Casarona, as attorney for Pauline and Donald

Colaner, advised BYA, Snyder, Bruce W. Baxter, Gergel, Kevin D. Farrar, Frederick Brandt and

Investment Consulting & Research, Inc. ("ICR"), c/o Fred Balser, of the Colaner's intent to

commence a FINRA arbitration against them in relation to financial planning investments that

they were involved in while employed with BYA and ICR.  A draft Statement of Claim was

annexed to Casarona's letter.  By letter dated June 21, 2006 to Lancer, BYA submitted notice of

Casarona's correspondence and the draft Statement of Claim to Lancer under the Fireman's Fund

Policy.  By letter dated June 28, 2006, Lancer, on behalf of Fireman's Fund, acknowledged

receipt of the Colaner matter from BYA.  By letter dated October 3, 2006, NASD forwarded

invoice number 06-0425-17-CH to BYA.  A Statement of Claim entitled *Donald R. Colaner, et

al. v. Michael Snyder, et al.*, NASD Arbitration Number 06-04245 ("the Colaner Arbitration")

was enclosed with the NASD's October 3, 2006 correspondence to BYA, which was received by

BYA on October 10, 2006.

By letter dated September 29, 2006, Lancer advised BYA that it was engaged to

administer the Colaner Arbitration on behalf of Fireman's Fund, and indicated that BYA

submitted the Colaner Arbitration to Fireman's Fund under the Fireman's Fund Policy.  By letter

dated November 8, 2006, Lancer advised BYA that Fireman's Fund agreed to defend BYA in the Colaner Arbitration, subject to a reservation of rights under the Fireman's Fund policy.

An Amended Statement of Claim was filed in the Colaner Arbitration on or about January 15, 2007.  The Claimants in the Colaner Arbitration named Snyder, Ferrar, B & G, BYA, Brandt, and Gergel as respondents.  Claimants alleged that individual broker/agent respondents were all employed by B & G, and that respondents sold them unsuitable investment and/or insurance products, including variable life insurance and annuities, and "churned" and continuously traded and swapped variable annuities.  All of the unsuitable "churning" and swapping of insurance and annuity products occurred during the decade prior to commencement of the Colaner Arbitration.  Claimants alleged that all of the respondents shared responsibility for the improper conduct associated with the unsuitable investments and the churning of annuities.  Claimants alleged that they participated in monthly meetings with respondent Gergel, and often in the presence of the other respondents.  Claimants further alleged that B & G, as employer of each of the non-broker dealer respondents, was libel for the tortious acts of its employees under the doctrine of *respondeat superior*.  Claimants alleged that BYA: (i) did not have adequate supervisory procedures in place to review the sale of annuity contracts or failed to follow those that were in place and further ignored red flags they are putatively trained to identify with respect to the purchase and sale of annuities; (ii) failed to adequately supervise the continuous swapping of annuity contracts; and (iii) failed to adequately supervise and prevent the churning of annuities.

## III.   Discussion

Lloyds contends that it is entitled to judgment as a matter of law that the Wahl

11

Arbitration is not covered under a policy of errors and omissions insurance issued to BYA for the period of December 31, 2006 to December 31, 2007, because the Wahl, Knotts and Colaner Arbitrations represent a single Claim that was made prior to the Policy Period. Specifically, Lloyds argues that the three Arbitrations arose out of Interrelated Wrongful Acts and should thus be treated as a single Claim that was first made over a year before the Lloyds Policy's inception date. BYA counters that, although the discovery dispute leading to this supplemental briefing purportedly related to additional discovery regarding pre-Policy claims, Lloyds ultimately relies on two claims for which it had already made coverage determinations and thus has waived or is estopped from raising any relation back defense. Alternatively, BYA argues that the Wahl Arbitration is not interrelated to the previous arbitrations.

### A.     Interpretation of Insurance Contracts Under New York Law

The parties agree that, per the express terms of the Policy, New York law applies to the resolution of the pending motions. Under New York law, the interpretation of a contract "is a matter of law for the court to decide."[15] Summary judgment may be granted where the words of a contract convey a definite and precise meaning without ambiguity.[16]

In deciding how to interpret an insurance contract, the Court undertakes a three-part analysis. First, the Court must determine "whether the contract is unambiguous with respect to the question disputed by the parties."[17] If the Court determines that a contract is not ambiguous,

---

[15]*Seneca Ins. Co. v. Kemper Ins. Co.*, No. 02 Civ. 10088, 2004 WL 1145830, at *4 (S.D.N.Y. May 21, 2004), *aff'd* 133 F. App'x 770 (2d Cir. 2005) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)).

[16]*Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 424, 428 (2d Cir. 1992).

[17]*Int'l Multifoods Corp.*, 309 F.3d at 83.

it "'should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence' and . . . may then award summary judgment."[18]  Neither party argues that the relevant terms of the Policy are ambiguous.

Where insurance contracts contain an exclusion provision, as does the Policy in this case, "'[t]he insurer generally bears the burden of proving that the claim falls within the scope of the exclusion . . . [by] establish[ing] that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case.'"[19]

### B.    Waiver and Estoppel

BYA asserts that Lloyds has waived its right to assert that the Wahl Arbitration claims arose out of Interrelated Wrongful Acts with the Colaner and Knotts Arbitrations and/or should be estopped from attempting to raise such a coverage defense at this late stage in the litigation, as this would substantially prejudice BYA.  Neither argument, however, finds support under New York law.

BYA first urges the Court to find that Lloyds waived its right to assert any relation back defense because it did not reference the defense generally or the Knotts and Colaner Arbitrations specifically in any of its reservation of rights letters.  Instead, Lloyds asserted that the Wahl Arbitration claims were not interrelated and did not alter that position until the Pretrial Order. New York law defines waiver as "a voluntary and intentional relinquishment of a known right."[20]

---

[18]*Id.* (quoting *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998)).

[19]*Quanta Lines Ins. Co. v. Inv. Capital Corp.*, No. 06 Civ. 4624(PKL), 2009 WL 4884096, at *9 (S.D.N.Y. Dec. 17, 2009) (quoting *Vill. of Sylvan Beach v. Travelers Indem. Co.*, 55 F.3d 114, 115-16 (2d Cir. 1995)).

[20]*New York v. AMRO Realty Corp.*, 936 F.2d 1420, 1431 (2d Cir. 1991).

13

"An insurer can be said to have waived certain defenses where there is proof that the insurer intended to abandon that defense, or where such an intention can clearly be inferred from the circumstances."[21]  When an insurer reserves its right to deny coverage, estoppel and waiver may not be inferred.[22]  Moreover, "the doctrine of waiver is inapplicable where the defense at issue is the existence or nonexistence of coverage."[23]

Here, even if Lloyds did not explicitly reserve its rights, it cannot be said to have waived its defenses to coverage.  The waiver doctrine articulated above is inapplicable in the present case, because Lloyds contests coverage altogether under an exclusion clause.  The New York courts have repeatedly stated that the doctrine of waiver does not apply where coverage itself is at issue.  Therefore, Lloyds' failure, in its initial denial letters, to deny coverage for interrelated claims filed before the "Policy Period" is not deemed a waiver of their defense that the claims asserted against BYA do not fall within the scope of the Policy's coverage.

Moreover, BYA's claim that Lloyds is equitably estopped from denying coverage also appears to fail under New York law.  Equitable estoppel is appropriate "where an insurer though in fact not obligated to provide coverage, without asserting policy defenses or reserving the privilege to do so, undertakes the defense of the case, in reliance on which the insured suffers the

_____

[21]*Interstate Indem. Co. v. Continental Ins. Co.,* No. 94 Civ. 5201, 1998 WL 118165, at *2 (S.D.N.Y. Mar. 16, 1998) (citing *AMRO Realty,* 936 F.2d at 1431).

[22]*See, e.g., K. Bell & Assoc., Inc. v. Lloyd's Underwriters,* No. 92 Civ. 5249, 1997 WL 96551, at *7 (S.D.N.Y. Mar. 5, 1997), *aff'd,* 129 F.3d 113, 1997 WL 701387 (2d Cir.1997); *see also* Matthew Bender, New York Insurance Law, New York Practice Series § 39.05[2] (1995) ("To avoid any possible risk of waiver or estoppel, the excess or umbrella insurer should send the insured a written notice that the insurer is reserving various rights to disclaim coverage. . . ."); 7C John Alan Appleman et al., Insurance Law and Practice § 4694 (2d ed. 1979) ("[I]f an insurer conducts an investigation or defense under . . . a notice of reservation of its rights, it will not thereby be estopped to set up any policy defenses that may be available to it.").

[23]*Interstate Indem.,* 1998 WL 118165 at *2 (citing *255 Albert J. Schiff Assoc. v. Flack,* 417 N.E.2d 84, 86 (N.Y. 1986)).

detriment of losing the right to control its own defense."[24]  "However, where the policy in question never provided coverage of that type of claim or of the particular insured, coverage can not be created through equitable estoppel solely because the insurer failed to make a timely disclaimer."[25]  An estoppel will lie only if the insured has been prejudiced by the insurer's actions.[26]

Here, BYA contends that, despite the numerous communications between the parties regarding whether the various arbitrations and claims were interrelated and Lloyd's acceptance of coverage under the Policy for the Wahl Arbitration, subject to its reservation of rights, Lloyds should have explained the opposite result if the Court denied its position that the claims were not interrelated.  Although it did not articulate its alternative single claim/ relation back defense until the Pretrial Order, Lloyds did reserve its right to assert certain policy defenses and that the claims asserted against BYA were not covered under the Policy.  Moreover, BYA cannot demonstrate that it detrimentally relied on Lloyd's conduct.[27]  Delay in disclaiming coverage fails to establish prejudice.[28]  BYA does not assert that the conduct of its defense of the Wahl Arbitration claim, in terms of its character and strategy, was prejudiced.[29]  Thus, Lloyds is not

---

[24]*Albert J. Schiff Assoc.,* 417 N.E.2d at 87.

[25]*Interstate Indem.,* 1998 WL 118165 at *4 (citations omitted).

[26]*Id.*

[27]*See id.* at *4 ("Prejudice from reliance on the insurer's conduct must be shown for equitable estoppel to be applied.").

[28]*See id.*

[29]*See Federated Dep't Stores, Inc. v. Twin City Fire Ins. Co.*, 807 N.Y.S.2d 62, 66-67 (N.Y. App. Div. 2006) (holding prejudice needed to justify estoppel is not to be presumed and can be established "only where the insurer's control of the defense is such that the character and strategy of the lawsuit can no longer be altered.").

precluded by the doctrine of equitable estoppel from asserting the defense of non-coverage, and the Court turns to the issue of whether the three Arbitrations constitute a single claim.

## C.      Single Claim

Lloyds asserts that the Knotts and Colaner Arbitrations are prior Claims that are interrelated by a common factual nexus with the wrongful acts alleged in the Wahl Arbitration. Accordingly, Lloyds contends that these claims should all be treated as a single claim under the Policy definition of that term, resulting in an accrual date that falls outside the Policy period. BYA argues that even if Lloyds is not estopped and did not waive the relation back defense, there are enough differences among the Arbitrations to deny Lloyd's request to deem them a single "Claim."  The Court agrees with BYA.

As the Court previously held, in order for claims to be interrelated, they must share a "sufficient factual nexus."[30]  One of the factors considered is whether the "wrongful acts" are contemporaneous, and whether there is a commons scheme or plan underlying the acts.[31]  The court "evaluates an inclusion based on the underlying facts rather than the legal theories pleaded or additional defendants named."[32]  Certainly, there is some overlap of the allegations and respondents.  As BYA points out, however, one of the factors the Court focused on in determining the twenty-six Wahl claims are interrelated wrongful acts is that each claimant alleged that they were damaged during the same claims-made policy period by the same

---

[30]*Quanta Lines Ins. Co. v. Inv. Capital Corp.*, No. 06 Civ. 4624(PKL), 2009 WL 4884096, at *14 (S.D.N.Y. Dec. 17, 2009) (collecting cases).

[31]*See Capital Growth Fin. LLC v. Quanta Specialty Lines Ins. Co.*, No. 07-80908-CIV, 2008 WL 2949492, at *4 (S.D. Fla. July 30, 2008) (collecting cases).

[32]*Seneca Ins. Co. v. Kemper Ins. Co.*, No. 02-Civ. 10088, 2004 WL 1145830, at *7 (S.D.N.Y. May 21, 2004), *aff'd* 133 F. App'x 770 (2d Cir. 2005).

individual broker/agents in the same office, under an alleged business model in which all of its representatives worked together as a team with respect to each customer—that is, a common scheme or plan underlying the alleged "churning" and "flipping" of the accounts.[33]  By contrast, the Knotts and Colaner Arbitrations do not allege that the same individual respondents acted as a team or that there was any common scheme or plan.  While Lloyds attempts to minimize this distinction, the Court finds it significant; otherwise, *any* claim involving the sale of unsuitable securities involving fraud, misrepresentation or failure to supervise that arose prior to the Lloyds' Policy Period would be deemed interrelated.  As noted when Lloyds accepted the Wahl Arbitration claim, there was nothing in the other Arbitrations to suggest to BYA that there were potential claims beyond those individual claims, that is, a scheme or pattern of wrongful acts.[34]  While the definition of Interrelated Wrongful Acts is broad, "a court must strictly and narrowly construe such provisions."[35]  Accordingly, Lloyds' motion for summary judgment on the single claim/relation back defense is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Supplemental Motion for Summary Judgment (Doc. 93) is DENIED.

**IT IS SO ORDERED.**

Dated: October 6, 2011

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[33]Doc. 89 at 19.

[34]Doc. 95, Ex. 1.

[35]*Home Ins. Co. of Ill. v. Spectrum Info. Tech., Inc.*, 930 F. Supp. 825, 848 (E.D.N.Y. 1996) (collecting cases).