IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
AT KANSAS CITY

| | |
|---|---|
| **BRECEK & YOUNG ADVISORS, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 2:09-cv-02516-JAR-GLR |
| ) | |
| **LLOYDS OF LONDON** ) | |
| **SYNDICATE 2003,** ) | |
| ) | |
| **Defendant.** ) | |

**PLAINTIFF'S PRELIMINARY FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

Plaintiff Brecek & Young Advisors, Inc. ("BYA"), submits the following Preliminary Findings of Fact and Conclusions of Law.

**The Policies**

1. In consideration of premiums paid, Lloyds issued to BYA a claims-made "Broker/Dealer and Registered Representatives Professional Liability Policy" effective December 1, 2006 through December 1, 2007 (the "Lloyds Policy"). **Doc. 152** (September 30, 2014 Memorandum and Order), pp. 8-9; *see also, Brecek & Young Advisors, Inc. v. Lloyds of London Syndicate 2003,* 715 F.3d 1231, 1233 (10th Cir. 2013); **Joint Ex. 1.**[1]

2. The Lloyds Policy had limits of $2 million "Each Claim" and in the aggregate, with a $50,000 "Each Claim" Retention for Broker/Dealer insureds. *Id.*

3. Immediately preceding the Lloyds Policy, Fireman's Fund Insurance Company issued to BYA a claims-made "Securities Broker/Dealers Errors and Omissions

---

[1] "Doc. ___" refers to the docket number in this case; "Joint Ex. ___" refers to the joint exhibit identified on the parties' joint exhibit list filed in this case.

Liability" policy, policy no. 8-17-ME 07318221, effective December 1, 2005 to December 1, 2006. ("FFIC Policy"). **Doc. 152**, p. 9; **Joint Ex. 27.**

4. The FFIC Policy was a renewal of a policy issued by Fireman's Fund to BYA effective December 1, 2004 to December 1, 2005, with the same policy number and same relevant terms, limits and deductibles as the FFIC Policy. **Joint Ex. 81**.

5. The FFIC Policy had limits of $2 million "Each Claim," and $10 million in the aggregate for Broker/Dealer insureds. **Doc. 152**, p. 9; **Joint Ex. 27**.

6. The FFIC Policy had a $50,000 per claim deductible applicable to claims against broker/dealer insureds like BYA. **Doc. 152**, pp. 9-10; **Joint Ex. 27**.

**The Knotts Claim**

7. On September 22, 2005, Michael Knotts commenced a lawsuit against one of BYA's registered representatives in the Court of Common Pleas for Summit County, Ohio, styled *Michael P. Knotts v. B&G Financial Network, Inc., et al.* **Doc. 152**, p.9; *Brecek,* 715 F.3d at 1235.

8. On December 19, 2006, the NASD notified BYA that BYA had been named as a respondent in a subsequent arbitration proceeding brought by Knotts. ("Knotts Arbitration"). **Doc. 152**, p.9; *Brecek,* 715 F.3d at 1236.

9. Fireman's Fund agreed to defend and indemnify BYA in the Knotts Arbitration under the FFIC Policy, ultimately paying $41,137 for defense and indemnity in excess of the applicable $50,000 "each claim" deductible. **Doc. 152**, p. 9; **Joint Ex. 84**.

10. BYA satisfied the $50,000 "Each Claim" deductible FFIC applied to defense and indemnity for the Knotts Arbitration. **Doc. 152**, p. 9; **Joint Ex. 84.**

11.     Lloyds was aware of the Knotts Arbitration no later than March 14, 2007, because BYA had also notified Lloyds of the Knotts Arbitration, and Lloyds denied coverage for that claim by letter dated March 14, 2007. *Brecek,* 715 F.3d at 1241; **Doc. 152**, p. 9; **Joint Ex. 94**.

### The Colaner Claim

12.     On June 13, 2006, attorneys for Pauline and Donald Colaner notified BYA of their intent to bring a NASD arbitration proceeding against BYA and several individual respondents. **Doc. 152,** pp. 9-10; *Brecek,* 715 F.3d at 1236.

13.     Fireman's Fund agreed to defend and indemnify BYA in the Colaner Claim and applied a $50,000 "Each Claim" deductible to the Colaner Arbitration. **Doc. 152**, p. 10.

14.     Fireman's Fund ultimately paid $593,447 for defense and indemnity for the Colaner Arbitration, in excess of the $50,000 deductible paid by BYA. **Doc. 152**, p. 10; **Joint Ex. 84**.

15.     Lloyds was aware of the Colaner Arbitration no later than October 29, 2007, because Lloyds referenced the Colaner Arbitration in its letter to BYA dated October 29, 2007 regarding Lloyds' tender of the Wahl Arbitration to Fireman's Fund. **Doc. 152**, p.10; *Brecek,* 715 F.3d at 1241; **Joint Ex. 4**.

### The Wahl Arbitration

16.     In May 2007, Paul and Marie Wahl served BYA with a Statement of Claim filed with the NASD. The complaint alleged that the Wahl claimants were sold unsuitable investment products, their accounts were "churned" to generate fees and BYA was liable for its failure to supervise certain individual respondents. **Doc. 152**, p. 10; *Brecek,* 715 F.3d at 1234-35; **Joint Ex. 85**.

3

17. BYA timely provided notice to Lloyds of the Wahl Arbitration and by letter dated August 9, 2007, Lloyds agreed to defend subject to a reservation of rights. **Doc. 152**, p.10; *Brecek,* 715 F.3d at 1236; **Joint Ex. 2**.

18. The August 9, 2007 letter provides with regard to "Settlement" that "[t]he insurer shall investigate and resolve a Claim in a manner that it deems appropriate." **Joint Ex. 2**.

19. At BYA's request, Lloyds appointed attorney Jeff Jamieson to defend BYA in the Wahl Arbitration. **Joint Ex. 90;** *see also, Brecek,* 715 F.3d at 1241 (referring to defense counsel as "Lloyds appointed counsel").

20. BYA also timely and properly tendered the claim to Fireman's Fund through a June 22, 2007 letter addressed to Lancer Claims Services, Inc. **Joint Ex. 38.**

21. By letter dated October 29, 2007, Lancer Claims Services, Inc., acting on behalf of Lloyds, notified BYA that it had tendered the Wahl Arbitration to Fireman's Fund to determine whether it was interrelated to the Colaner Arbitration. **Doc. 152**, p. 11; *Brecek,* 715 F.3d at 1241; **Joint Ex. 4**.

22. "By email sent November 20, 2007, Lloyds notified BYA that coverage counsel for both Lloyds and Fireman's Fund had determined the Colaner claims were not interrelated with the Wahl claims." *Brecek,* 715 F.3d 1236; **Joint Ex. 48.**

23. Lloyds notified BYA by letter dated December 12, 2007, that it considered each of the twenty-six individual Wahl claimants to be distinct from the others and therefore subject to separate $50,000 "Each Claim" retentions. **Doc. 152**, p. 12; *Brecek,* 715 F.3d at 1236; **Joint Ex. 5**.

4

24. As set forth in its December 12, 2007 letter, Lloyds was aware of the "Interrelated Wrongful Acts" provision in its policy, stating that Lloyds would "consider all claims based upon or arising out of the same Wrongful Act or Interrelated Wrongful Acts as one claim." **Doc. 152,** p. 12; *see also, Brecek,* 715 F.3d at n.7; **Joint Ex. 5**.

25. Lloyds, however, took the position that "the [Wahl] claimants are entirely unrelated except for the fact that they have retained the same attorney to bring their claims." **Doc. 152**, p. 12; *see also,* **Joint Ex. 5.**

26. The representation by Lloyds that the twenty-six Wahl claims were separate and distinct was consistent with Lloyds' representation that the Wahl Arbitration did not relate back to the FFIC Policy period and further solidified BYA's understanding that Lloyds, rather than Fireman's Fund, would provide coverage, as each of the Wahl claims was made against BYA during the Lloyds Policy period.

27. By letter dated October 20, 2008, BYA disagreed with Lloyds' analysis of coverage under the Policy regarding the Wahl Arbitration and, specifically, Lloyds' construction of the term "Interrelated Wrongful Acts" as applied to the claims asserted against BYA in the Wahl Arbitration. **Doc. 152**, p. 13; *Brecek,* 715 F.3d at 1236.

28. On November 16, 2007, Lancer Claims requested that New York attorney, Andrew Margulis of Ropers Majeski Kohn & Bentley law firm, review and analyze the Wahl claim documents to determine whether Wahl was interrelated to Colaner or Knotts on behalf of Lloyds. **Joint Ex. 66**.

29. By letter dated December 17, 2008, Mr. Margulis responded to Ms. Haag's October 20, 2008 letter and reiterated Lloyds' position that the twenty-six Wahl claims were not interrelated to each other under the Lloyds Policy such that twenty-six

5

separate retentions would apply.  There was no mention of relation-back to Colaner or Knotts.  **Joint Ex. 74**.

30. On January 21, 2009, counsel for BYA wrote to Mr. Margulis, Lloyds' coverage counsel, requesting that Lloyds reconsider its position on the relatedness of the twenty-six Wahl claims.  **Joint Ex. 75**.

31. By letter dated February 3, 2009, Lloyds' coverage counsel responded and again reiterated that the twenty-six Wahl claims were not interrelated.  There was no mention of relation-back to Colaner or Knotts.  **Joint Ex. 76**.

32. Lloyds never properly reserved its right to later raise the relation-back defense.  *Brecek,* 715 F.3d at 1241-42 and n.7.

33. Lloyds did not assert its relation-back defense in this matter until the initial pretrial order, after discovery had been completed. *Brecek,* 715 F.3d at 1241; **Doc. 152**, pp. 4, 6.

### Settlement of the Wahl Arbitration

34. On or about March 3, 2009 BYA entered into Mutual Release and Settlement Agreements with the claimants in the Wahl Arbitration.  **Doc. 152**, p. 13; *Brecek,* 715 F.3d at 1236; **Joint Ex. 87**.

35. The Mutual Release and Settlement Agreements specifically reserved BYA's right to bring claims against Lloyds arising out of the Wahl Arbitration, including the right to assert that only one $50,000 "Each Claim" retention applied to the Wahl Arbitration under the Lloyds Policy.  **Joint Ex. 87**.

36. BYA's portion of the settlement amount paid to the Wahl claimants was $669,092.21, paid on March 27, 2009.[2] **Doc. 152**, p. 13; **Joint Exs. 88** and **91**.

37. BYA paid an additional $312,767.38 for fees and expenses related to the defense of the Wahl Arbitration. **Doc. 152**, p. 13; **Joint Exs. 89** and **91**.

38. Lloyds prorated the defense costs (attributing defense equally to each of the twenty-six (26) claims or sets of claims in the Wahl Arbitration), then paid only indemnity for each claim that exceeded the $50,000 "Each Claim" retention, for a total payment by Lloyds of $384,657.79 for defense and indemnity. **Doc. 152**, p. 13; **Joint Ex. 91**.

39. The total paid in defense and indemnity for the Wahl Arbitration was $1,366,517.38 [$669,092.21 (BYA's portion of indemnity) + 312,767.38 (BYA's portion of defense) + $384,657.79 (Lloyds' portion of defense and indemnity) = $1,366,517.38]. **Doc. 152,** n. 41; **Joint Exs. 88, 89, 91.**

40. After deducting the $384,657.79 paid by Lloyds, and one $50,000 "Each Claim" Retention from the total incurred amount of $1,366,517.38, the net unreimbursed amount paid by BYA for defense and settlement of the Wahl Arbitration is $931,859.59. **Doc. 152,** pp. 13-14; **Joint Exs. 88, 89, 91**.

**Coverage Litigation History**

41. After this Court denied summary judgment to Lloyds and granted summary judgment to BYA, ruling that the twenty-six Wahl claims were a single claim

---

[2] Payment on behalf of BYA was made via check No. 031944 issued by Securities America Fin. Corp., which purchased BYA from its former parent company, Security Benefit Corp. on October 31, 2008. BYA, however, remained ultimately responsible for payment of the settlement and defense costs.

subject to one $50,000 "Each Claim" retention, Lloyds filed its supplemental motion for summary judgment on its relation-back defense. **Docs. 93**, **94** and **152,** p. 14.

42. Lloyds requested this Court grant summary judgment in its favor and order BYA to reimburse Lloyds for all sums Lloyds had paid in damages and/or defense costs on behalf of BYA in the Wahl Arbitration. **Docs. 93**, **94** and **152,** p. 14.

43. This Court denied Lloyds' motion and Lloyds' appealed. **Docs. 100, 114** and **152,** p. 14.

44. Lloyds did not appeal the Court's ruling that the twenty-six claimants' claims in the Wahl Arbitration constituted a single, interrelated claim, subject to one "Each Claim" retention. **Doc. 152**, p. 5.

45. The Tenth Circuit Court of Appeals held that the Wahl, Knotts and Colaner claims were all related, as "[s]everal common facts connect the Wahl, Knotts, and Colaner Arbitration." **Doc. 152**, p. 14; *Brecek,* 715 F.3d at 1239.

46. The Tenth Circuit Court of Appeals reversed the Court's conclusion that the claims asserted in the Wahl Arbitration did not relate back to Knotts and Colaner. However, the Court of Appeals also held that the Court erred in concluding that Lloyds was not equitably estopped from denying coverage for Wahl. **Doc. 152**, p.15, *Brecek,* 715 F.3d 1231.

**Estoppel/Detrimental Reliance**

47. The Tenth Circuit Court of Appeals ruled that "[u]nder New York law, the doctrines of waiver and estoppel may operate to prevent an insurer from denying coverage notwithstanding the terms of the policy." *Brecek,* 715 F.3d at 1239 (citations omitted).

48. The differences between the concepts of waiver and equitable estoppel are that estoppel is not rendered inapplicable simply because coverage is at issue and estoppel requires a showing of prejudice, while waiver does not. **Doc. 152,** pp. 16-18; *Brecek,* 715 F.3d at 1240; *see also, Albert J. Schiff Assocs., Inc. v. Flack,* 417 N.E.2d 84 (N.Y. 1980); *Lone Star Indus., Inc. v. Liberty Mut. Ins. Co.*, 689 F.Supp. 329, 333 (S.D.N.Y.1988).

49. The Tenth Circuit held that although BYA's waiver argument was inapplicable, the doctrine of estoppel applied because BYA had proven on the summary judgment record alone that BYA had been prejudiced *as a matter of law* by Lloyds' representations and conduct, at least as to the $385,000 Lloyds' agreed to pay to defend and settle Wahl. *Brecek,* 715 F.3d at 1243.

50. The Tenth Circuit Court of Appeals remanded this matter for the Court to determine what additional damages, if any, BYA is entitled to due to Lloyds' representations regarding coverage and to consider whether Lloyds' representation that the twenty-six Wahl claimants were separate somehow negated BYA's detrimental reliance.

51. New York cases holding that an insurer was estopped from denying coverage have typically, but not necessarily, involved fact patterns in which the insured had irrevocably changed its position, as here with the settlement of the Wahl Arbitration. *See, e.g., Marino v. New York Telephone Co.*, 1992 WL 212184 (S.D. N.Y. 1992); *but see Jefferson Ins. Co. of New York v. Travelers Indem. Co.,* 92 N.Y.2d 363, 681 N.Y.S.2d 208, 703 N.E.2d 1221 (1998) (after insurer waited four and a half years prior to asserting

9

position, court found insurer estopped from raising certain defenses, even though the insured had not changed its position as a result).

52. Frequently, as here, estoppel arises when an insurer undertakes to defend or indemnify the insured in an action, then withdraws after the insured has taken actions that could not be undone. *See, e.g., Boston Old Colony Ins. Co. v. Lumbermens Mut. Cas. Co.,* 889 F.2d 1245 (2nd Cir. 1989) (finding insurer estopped from denying coverage where it attempted to disclaim liability ten months after the underlying matter was settled and four years after the accident occurred); *Allstate Ins. Co. v. Gross,* 265 N.E.2d 736 (1970) (insurer estopped due to seven-month delay in disclaiming liability; *State Farm Mut. Ins. Co. v. Pizzonia,* 147 A.D.2d 703 (N.Y. 2nd Dept. 1989) (insurer estopped after delay of two and one-half years in disclaiming liability).

53. Certain New York estoppel cases have held that "[p]rejudice is established only where the insurer's control of the defense is such that the character and strategy of the lawsuit can no longer be altered." *Brecek*, 715 F.3d at 1242 (citations omitted).

54. Under New York law, "controlling the defense" means "assuming" or "undertaking" the defense of the underlying action on behalf of the insured. If an insurer agrees to defend without properly reserving its rights, it will be estopped from disclaiming coverage. *See, e.g., Hartford Ins. Group v. Mello,* 81 A.D.2d 577, 578 (N.Y. 2d Dept. 1981) ("Where an insurer defends an action on behalf of an insured, with knowledge of a defense to the coverage of the policy, it thereafter is estopped from asserting that the policy does not cover the claim." (citations omitted); *Brooklyn Hosp. Ctr. v. Centennial Ins. Co.,* 258 A.D.2d 491, 491-92 (N.Y. 2d Dept. 1999), ("[W]hen an insurer assumes the defense of an action on behalf of the insured, with knowledge of facts

constituting a defense to the coverage of the policy and without disclaiming liability or giving notice of its right to deny coverage, it may be estopped from later asserting that the policy does not cover the claim.") (citations omitted); *see also, Narragansett Elec. Co. v. Am. Home Assur. Co.,* 999 F.Supp.2d 511, 524 (S.D.N.Y. 2014) (noting that an insurer that "exercises its right, and honors its duty to assume the defense can control both the extent and duration of defense costs.") (citations omitted).

55. The Tenth Circuit Court of Appeals rejected this Court's earlier determination that "BYA does not assert that the conduct of its defense of the Wahl Arbitration claim, in terms of character and strategy, was prejudiced." *Brecek,* 715 F.3d at 1241.

56. Instead, the Tenth Circuit Court of Appeals found that the evidence established that "Lloyds controlled the defense of the Wahl Arbitration throughout its entirety to its termination and contributed to its settlement, and consistently acted as though the Wahl claims were covered under the Policy, subject only to a dispute as to the amount of applicable retentions." **Doc. 152**, p. 6; *citing Brecek,* 715 F.3d at 1242 ("Here, it is axiomatic that the character and strategy of the Wahl Arbitration can no longer be altered because it was settled").

57. However, remand was necessary because the summary judgment record before the Tenth Circuit Court of Appeals lacked sufficient evidence regarding the availability of other coverage for the Wahl claim, and BYA's specific reliance on Lloyds' representations and actions which caused BYA to forego pursuit of its other insurance before Lloyds settled the Wahl Arbitration.

58.     For example, although the Tenth Circuit was aware that Fireman's Fund had provided BYA with claims-made coverage prior to the Lloyds' Policy for the related Colaner and Knotts claims, it lacked evidence regarding the applicable deductible and whether there were limits remaining under the FFIC Policy to pay the Wahl claim. *See, Brecek,* 715 F.3d at 1236.

59.     Similarly, the Tenth Circuit lacked the benefit of the Ms. Farmer's and Ms. Haag's testimony that if Lloyds had reversed its position on relation-back *before* the Wahl settlement (rather than 18 months after the settlement, as it did), BYA would have pursued Fireman's Fund for coverage, and insisted on Fireman's Fund's involvement in the defense and settlement of Wahl.

60.     BYA has no qualms with the manner or sufficiency of Mr. Jamieson's handling of the defense and settlement of Wahl at Lloyds' behest.  However, the defense and resolution of Wahl indisputably would have been different but for Lloyds' representations that Wahl did not relate back because BYA would have insisted on Fireman's Fund's involvement in defense and settlement of Wahl.

61.     BYA reasonably and detrimentally relied on Lloyds' promise to provide coverage for Wahl subject only to a dispute about the number of applicable retentions.

62.     BYA was justified in relying upon Lloyds' representations about coverage. "It is well-established that, as between an insurer and its assured, a fiduciary relationship does exist, requiring utmost good faith by the carrier in its dealings with its insured. In defending a claim, an insurer is obligated to act with undivided loyalty; it may not place its own interests above those of its assured." *Hartford Acc. & Indem. Co. v. Michigan Mut. Ins. Co.,* 93 A.D.2d 337, 340-41 (N.Y. 1st Dept. 1983).

12

**Coverage and Remaining "Per Claim" Limits Under the FFIC Policy**

63. Under the terms of both the Lloyds and Fireman's Fund policies, if the Knotts, Colaner and Wahl claims are interrelated, they are to be treated as a single claim deemed to have arisen at the time of the first such claim. **Doc. 152**, p. 14; s*ee also,* **Joint Exs. 1** and **27**.

64. Both the Knotts and Colaner Claims arose during the FFIC Policy period and were covered by Fireman's Fund under the FFIC Policy. **Doc. 152**, p. 14.

65. Accordingly, because Colaner, Knotts and Wahl claims are all interrelated, the Wahl Arbitration would have been covered by the FFIC Policy.

66. Fireman's Fund imposed a $50,000 "Each Claim" deductible for each of the Colaner and Knotts claims. **Doc. 152**, p. 14-15.

67. After payment of defense and indemnity for the Knotts and Colaner claims in excess of the "Each Claim" deductible, there would have been at least $1,365,416 of the $2 million "Each Claim" limits available under the FFIC Policy to pay defense and indemnity for the Wahl Arbitration. **Doc. 152**, p. 15; *see also,* **Joint Ex. 84**.

**Lloyds' Defenses are Inapplicable**

68. After remand, Lloyds sought to join Fireman's Fund as a third-party defendant in this litigation, stating that "[Fireman's Fund] should be liable to [Lloyds] to the same extent Lloyds is or may be liable to BYA." **Doc. 152**, pp. 23, 25.

69. The Court denied Lloyds' Motion finding that "Lloyds has not shown that Fireman's Fund either may be liable to it for the claims asserted by BYA or that [its] proposed claims against Fireman's Fund are dependent on the current issue on remand

13

before the Court," and because adding Fireman's Fund as a party at such a late stage in the current litigation would prejudice BYA. **Doc. 152**, pp. 25-26.

70. Similarly, to the extent Lloyds attempts to shift blame to other third parties, like BYA's broker, CalSurance; Fireman's Fund; Lloyds' claims adjuster, Lancer Claims Services, Inc.; or Lloyds' outside legal counsel, Andrew Margulis, that would be improper.

71. The mandate from the Tenth Circuit requires the Court to determine the extent to which BYA relied upon *Lloyds'* representations that it would cover the Wahl Arbitration, subject only to a dispute about the number of "Each Claim" retentions.

72. BYA detrimentally relied upon Lloyds' representations that Lloyds would provide coverage for Wahl; BYA did not and could not detrimentally rely on Fireman's Fund representations about coverage because Fireman's Fund *denied* coverage (notably, for reasons consistent with Lloyds' acceptance of coverage--that Wahl did not relate back).

73. With regard to Lancer Claims Services and Andrew Margulis, both were acting as agents of Lloyds at all times relevant to the Wahl claim; Lloyds cannot escape liability for representations that were made on Lloyds' behalf through its agents. *See, e.g.,* **Joint Exs. 74, 96, 98,** and **99.**

74. New York law recognizes that attorneys act as agents of their clients. *See, e.g., Purgess v. Sharrock,* 33 F.3d 134, 144 (2d Cir. 1994) (holding that a statement made by defense counsel in the footnote of a brief was admissible against her client). Any implication by Lloyds that Mr. Margulis was working in anyone's interest but Lloyd's when writing a coverage letter on Lloyds' behalf is misplaced. Notably, Mr. Margulis'

14

December 2008 correspondence stated that his firm had been retained "by Lancer Claims Services *on behalf of Catlin/Lloyd's of London Syndicate* ("Catlin") in connection with the referenced matter. Moreover, Mr. Margulis reiterated Lloyds' earlier coverage position set forth in its December 12, 2007 letter. **Joint Exs. 5** and **74.**

75. Similarly, Lancer Claims was acting on behalf of Lloyds as Lloyds' claims adjuster for the Wahl Arbitration claim. Lancer Claims' correspondence to BYA about the Wahl claim plainly stated that Lancer had been "engaged to handle [the Wahl claim] on behalf of Catlin/Lloyds of London Syndicate. . . ." *See, e.g.,* **Joint Exs. 2, 4** and **5.**

76. Because BYA had back-to-back claims-made policies, either the Lloyds Policy or the FFIC Policy would provide coverage for the Wahl Arbitration, but not both. BYA had no reason to pursue Fireman's Fund because Lloyds had accepted coverage without reserving any relation-back defense. Pursuing Fireman's Fund would have been a waste of time and money, since Lloyds had agreed to cover the Wahl claim, subject only to the dispute about the number of "Each Claim" retentions.

77. Even if BYA were able to pursue Fireman's Fund for coverage of the Wahl claim now, nearly six years after Lloyds settled the Wahl Arbitration, Lloyds' settlement of Wahl created coverage defenses that otherwise would not have existed under the FFIC Policy. Specifically, Fireman's Fund could now raise the voluntary payments and failure to obtain consent to settlement provisions under the FFIC Policy, as well as laches, statute of limitations, and other defenses related to the delay in pursuing the coverage claim caused by Lloyds. *See, e.g., Schwartz v. Liberty Mut. Ins. Co.,* 539 F.3d 135 (2d Cir. 2008) (insurer argued that policyholder forfeited his right to coverage by failing to obtain the consent of insurers before entering into settlement).

15

78. Additionally, to require BYA to pursue Fireman's Fund or another third-party would be highly prejudicial to BYA as it would further delay BYA's recovery and BYA would necessarily incur additional significant attorneys' fees and costs.

**The Extended Reporting Period under the FFIC Policy is Irrelevant**

79. The Extended Reporting Period under the FFIC Policy is irrelevant to coverage here because the Tenth Circuit Court of Appeals has determined that the Wahl claims are interrelated with Colaner and Knotts.

80. Under the terms of the Lloyds Policy and FFIC Policy, interrelated claims are deemed made whenever the first related claim was made and reported, regardless of other reporting requirements. Additionally, neither Lloyds nor Fireman's Fund raised late or improper notice as a reason for denying the Wahl claim. **Joint Exs. 1** and **35.**

## II.  CONCLUSION

BYA is entitled to reimbursement from Lloyds of all funds BYA paid to defend and settle the Wahl Arbitration minus a single $50,000 retention. BYA reasonably and detrimentally relied on Lloyds' representations that Lloyds would provide coverage for the Wahl Arbitration, subject only to a dispute about the number of applicable retentions under the Lloyds Policy. Lloyds' representations caused BYA to forego other available coverage from Fireman's Fund. Lloyds' representation that the twenty-six Wahl claims were separate and distinct did not negate BYA's reliance, as that representation was consistent with and further solidified BYA's understanding that Lloyds, rather than Fireman's Fund, would provide coverage.

For the reasons articulated herein, Lloyds must be estopped from denying full coverage of Wahl as a single claim and BYA is entitled to reimbursement of $931,859.59 plus pre judgment interest, additional fees and costs, and any other relief the Court deems appropriate and just.

Date:  February 18, 2015			Respectfully submitted,

						LATHROP & GAGE LLP


						/s/ *Michael J. Abrams*
						Michael J. Abrams     KS Bar # 15407
						mabrams@lathropgage.com
						Kimberly K. Winter    KS Bar #17912
						kwinter@lathropgage.com
						2345 Grand Boulevard, Suite 2200
						Kansas City, Missouri 64108-2684
						(816) 292-2000 – Telephone
						(816) 292-2001 – Facsimile

						**ATTORNEYS FOR PLAINTIFF**


### CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of February, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notice of electronic filing to all counsel of record.


						  /s/ *Michael J. Abrams*
						Attorney for Plaintiff