IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
AT KANSAS CITY

| | |
|---|---|
| BRECEK & YOUNG ADVISORS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:09-cv-02516JAR-GLR |
| | ) |
| LLOYDS OF LONDON | ) |
| SYNDICATE 2003, | ) |
| | ) |
| Defendant. | ) |

### DEFENDANT'S SUPPLEMENTAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

COMES NOW defendant Lloyds of London Syndicate 2003 ("Lloyds"), by and through the undersigned counsel, pursuant to Fed. R. Civ. Pro. 52(a)(1) and D. Kan. Rule 52.1(a), and respectfully submits the following supplemental proposed findings of fact and conclusions of law:

### Proposed Findings of Fact

1. In consideration of premiums paid, Lloyds issued to Brecek & Young Advisors, Inc. ("BYA") a claims-made "Broker/Dealer and Registered Representatives Professional Liability Policy" effective December 1, 2006 through December 1, 2007 (the "Lloyds Policy"). The Policy had limits of $2 million "Each Claim" and in the aggregate, with a $50,000 "Each Claim" Retention for Broker/Dealer insureds. (*See* Doc. 152, pages 8-9; *see also* Exhibit 1.)

2. Immediately preceding the Lloyds Policy, Fireman's Fund issued to BYA a claims-made "Securities Broker/Dealers Errors and Omissions Liability" policy, effective December 1, 2005 to December 1, 2006 ("FFIC Policy"). The FFIC Policy had limits of $2 million "Each Claim," and $10 million in the aggregate for Broker/Dealer insureds. (*See* Doc. 152, page 9; *see also* Exhibit 27.)

3. On September 22, 2005, Michael Knotts commenced a lawsuit in the Court of Common Pleas for Summit County, Ohio, styled *Michael P. Knotts v. B & G Financial Network, Inc., et al.* On December 19, 2006, the NASD notified BYA that it had been named as a respondent in an arbitration proceeding brought by Knotts. (*See* Doc. 152, page 9; *see also* Exhibit 13.)

4. The Knotts Claim alleged that certain individual respondents had fraudulently induced Knotts to retire early, churned his investment accounts and failed to properly advise him about issues impacting his financial portfolio. Fireman's Fund applied a $50,000 "Each Claim" deductible to the Knotts Claim, which was satisfied by BYA. Fireman's Fund agreed to defend and indemnify BYA in the Knotts Claim, ultimately paying $41,137 for defense and indemnity in excess of the $50,000 deductible. (*See* Doc. 152, page 9; *see also* Exhibit 13.)

5. Lloyds was aware of the Knotts Claim no later than March 14, 2007, because BYA had also notified Lloyds of the Knotts Claim, and Lancer denied coverage for that claim by letter dated March 14, 2007. (*See* Doc. 152, page 9; *see also* Exhibit 94.)

6. Jeffrey Jamieson of the law firm Blackwell Sanders, L.L.P., defended and ultimately settled the Knotts claim on behalf of BYA. (*See* Doc. 152, page 10; *see also* Exhibit 58.)

7. On June 13, 2006, attorneys for Pauline and Donald Colaner notified BYA of their intent to bring a NASD arbitration proceeding against it and several individual respondents. (*See* Doc. 152, pages 9-10; *see also* Exhibit 14.)

8. The Colaner claimants alleged that BYA was liable for negligently failing to supervise the individual respondents, who provided unsuitable investment advice and made fraudulent misrepresentations regarding investments. Fireman's Fund applied a $50,000 "Each Claim" deductible to the Colaner Arbitration, which was satisfied by BYA. Fireman's Fund

agreed to defend and indemnify BYA in the Colaner Claim, ultimately paying $593,447 for defense and indemnity in excess of the $50,000 deductible. (*See* Doc. 152, page 10; *see also* Exhibit 14.)

9.     Lloyds was aware of the Colaner Arbitration no later than October 29, 2007, because Lancer referenced the Colaner Arbitration in its letter to BYA dated October 29, 2007. (*See* Doc. 152, page 10; *see also* Exhibit 4.)

10.    Mr. Jamieson also defended and ultimately settled the Colaner claim on behalf of BYA. (*See* Doc. 152, page 10; *see also* Exhibit 14.)

11.    In May 2007, Paul and Marie Wahl served BYA with a Statement of Claim filed with the NASD. The complaint alleged that the Wahl claimants were sold unsuitable investment products, their accounts were "churned" to generate fees and BYA was liable for its failure to supervise certain individual respondents. (*See* Doc. 152, page 10; *see also* Exhibit 85.)

12.    BYA timely provided notice to Lloyds of the Wahl Arbitration and by letter dated August 9, 2007, Lancer stated that Lloyds agreed to defend subject to reservation of rights. (*See* Doc. 152, page 10; *see also* Exhibit 2.)

13.    BYA specifically requested Lloyds to assign the defense of the Wahl claim to Mr. Jamieson, since he was already representing BYA in the Knotts and Colaner claims and was familiar with BYA's business practices. Ultimately, Lloyds approved the request and assigned Mr. Jamieson to defend Wahl on behalf of BYA. (*See* Transcript of the Testimony of Natalie G. Haag, page 41, line 5 through page 43, line 23.)

14.    On June 22, 2007, Leia Farmer, chief compliance officer for BYA, sent a cover letter to Lancer Claims attaching the Wahl claim (including the statement of claim and various arbitration papers) and stating, "I would like to submit a claim under the firm's Error and Omission

3

Coverage policy number #8-17 ME 07318221." This policy number corresponded with the FFIC policy. Ms. Farmer testified that this is the manner in which she tendered claims on behalf of BYA to its insurance carriers. (*See* Transcript of the Testimony of Leia A. Farmer, page 57, lines 2 through 20; and page 66, line 22 through page 67, line 8; *see also* Exhibit 22.)

15. In 2007, Lancer Claims Services and CalSurance were wholly owned subsidiaries of Brown & Brown of California, Inc. Lancer Claims served as the adjusting arm of the business, while CalSurance served as the brokerage or selling arm of the insurance business. Lancer and Calsurance were in the same office building. (*See* Transcript of the Testimony of Frank Regan, page 32, line 7 through page 33, line 11.)

16. In 2007, Lancer was adjusting claims for both Fireman's Fund and Lloyds. Fifty-percent of the claims Lancer adjusted were on behalf of Fireman's Fund, while only 10% were on behalf of Lloyds. (*See* Transcript of the Testimony of Frank Regan, page 74, lines 10 through 15.)

17. Frank Regan, a former adjuster for Lancer Claims, testified that he began simultaneously adjusting the Wahl claim in middle 2007 under both the Lloyds Policy and the FFIC Policy. (*See* Transcript of the Testimony of Frank Regan, page 47, line 17 through page 48, line 12.)

18. By letter dated October 29, 2007, Lancer notified BYA that the Wahl Arbitration had been tendered to Fireman's Fund to determine whether or not it was interrelated to the Colaner Arbitration. (*See* Doc. 152, page 11; *see also* Exhibit 4.)

19. Additionally, in or about the fall of 2007, Lancer Claims, on behalf of Lloyds, retained Andrew L. Margulis of the law firm Ropers, Majeski, Kohn, Bentley, P.C., to provide a legal analysis and opinion on whether the Wahl claim was interrelated to the earlier Knotts and Colaner claims. Mr. Margulis ultimately concluded that Wahl was not interrelated to these earlier

claims and did not arise out of Interrelated Wrongful Acts. (*See* Exhibit 68; *see also* Transcript of the Testimony of Frank Regan, page 109, line 6 through page 110, line 7.)

20. By e-mail sent November 20, 2007, Cynthia Dilly of Lancer Claims, writing on behalf of FFIC, informed Steve Knowles at Calsurance that coverage counsel for both Lloyds and Fireman's Fund had determined that the Colaner Arbitration was not interrelated with the Wahl Arbitration. That same date, Mr. Knowles forwarded Ms. Dilly's e-mail to Ms. Farmer at BYA. (*See* Doc. 152, page 11; *see also* Exhibit 31.)

21. Farmer testified that, based upon the notification from Lloyds that independent coverage counsel for both Lloyds and Fireman's Fund deemed the Wahl Arbitration unrelated to the Colaner Arbitration, BYA understood the Wahl Arbitration would be covered under the Lloyds Policy and took no further action to pursue coverage under the FFIC Policy. (*See* Doc. 152, page 11.)

22. By a letter from Cynthia L. Dilly of Lancer Claims, dated November 26, 2007, Fireman's Fund denied coverage for the Wahl Arbitration based on its determination "that the recently filed claims are not covered by the expired policy." The letter states that "a suggestion has been made that because some of the allegations made in the recently filed [Wahl] arbitration are similar to claims made against the insured in a prior arbitration filed by . . . Colaner . . . the Company should treat the claims as if they were covered under the expired policy." Fireman's Fund further stated that "there is apparently other valid and collectible insurance." However, Fireman's Fund never stated that Wahl was not interrelated to Knotts. (*See* Doc. 152, page 11; *see also* Exhibit 49.)

23. Farmer testified that BYA was not surprised by Fireman's Fund's denial of coverage because it was consistent with the earlier correspondence from Lloyds that both coverage

5

{0179330.DOCX}

counsel for Fireman's Fund and Lloyds had determined that the Wahl Arbitration was not related to the earlier Colaner Claim and would be handled by Lloyds. (*See* Doc. 152, pages 11-12.)

24.     Farmer further testified that if the November 26, 2007 letter had relayed that the Wahl and Colaner Claims were interrelated, she would have "reached out" to Fireman's Fund to secure coverage, and admitted that she could not recall BYA tendering the Wahl Arbitration to Fireman's Fund (even though her June 22, 2007 letter suggests otherwise). (*See* Doc. 152, page 12.)

25.     BYA took no additional steps to challenge or dispute FFIC's denial of coverage of the Wahl claim. Natalie G. Haag, former assistant general counsel at BYA's parent company, Security Benefit Corporation, testified that neither she nor Ms. Farmer ever challenged Fireman's Fund's coverage determination in Wahl even though they could have done so. (*See* Transcript of the Testimony of Natalie G. Haag, page 54, line 9 through page 55, line 22.)

26.     On November 26, 2007, Mr. Margulis wrote to Mr. Regan at Lancer Claims concerning his coverage opinion in Wahl. In addition to informing Regan that, in his opinion, "the Wahl, Colaner and Knotts matters do not arise out of Interrelated Wrongful Acts and cannot be deemed a single Claim under the policies preceding the [Lloyds] Policy," Margulis also opined that the Wahl claimants were "entirely unrelated except for the fact that they have retained the same attorney to bring their claims." As such, Margulis concluded that the claims asserted in Wahl should be subject to separate $50,000 retentions and he recommended that Lancer, on behalf of Lloyds, advise BYA of this position. (*See* Transcript of the Testimony of Frank Regan, page 111, line 19 through page 117, line 14; *see also* Exhibit 68.)

27.     By letter dated December 12, 2007, Lancer supplemented its previous coverage letter dated August 9, 2007, and notified BYA that it considered each of the twenty-six individual

6

{0179330.DOCX}

Wahl claimants to be distinct from the others and therefore subject to separate $50,000 "Each Claim" retentions. (*See* Doc. 152, page 12; *see also* Exhibit 5.)

28. As set forth in the December 12, 2007 letter, Lancer acknowledged the "Interrelated Wrongful Acts" provision in the Lloyds policy, stating that it would "consider all claims based upon or arising out of the same Wrongful Act or Interrelated Wrongful Act as one claim." Lancer took the position, however, that "this is not a situation in which the claimants were given advice as a group, or one where every claimant was sold the identical investment product," and accordingly, "the [Wahl] claimants are entirely unrelated except for the fact that they have retained the same attorney to bring their claims." (*See* Doc. 152, page 12; *see also* Exhibit 5.)

29. Lancer noted that the same rationale was being raised in a Motion to Sever Claims pending in the Wahl Arbitration, and thus "the claims presented cannot be deemed a single Claim under the policy," and that each claim would be considered a separate claim subject to a separate $50,000 retention, whether or not the Motion to Sever was granted or denied. (*See* Doc. 152, pages 12-13; *see also* Exhibit 5.)

30. By letter dated October 20, 2008, BYA disagreed with Lloyds' analysis of coverage under the Policy regarding the Wahl Arbitration and, specifically, Lloyds' construction of the term "Interrelated Wrongful Acts" as applied to the claims asserted against BYA in the Wahl Arbitration. BYA took the position that the matter involved a continuous time period with one act of BYA at issue, specifically, whether BYA adequately supervised its representatives. (*See* Doc. 152, page 13; *see also* Exhibit 6.)

31. Haag, who authored the October 20, 2008 correspondence on behalf of BYA, testified that, by that time, BYA was rejecting Lloyds' coverage position concerning the number of applicable retentions under the Lloyds Policy for Wahl. She also testified that the logic she

applied in her October 20, 2008 correspondence to find that the Wahl claims were interrelated could also apply to the Knotts and Colaner claims. (*See* Transcript of the Testimony of Natalie G. Haag, page 63, line 10 through page 65, line 4; and page 74, lines 3 through 8.)

32. On December 17, 2008, Margulis wrote to Haag, responding to her October 20, 2008 correspondence. He reiterated Lloyds' position that each of the Wahl claimants had made a separate claim and were therefore subject to separate retentions. Thereafter, on January 21, 2009, Michael Abrams, writing on behalf of BYA, responded to Margulis' December 17th correspondence and rejected the notion that Wahl involved "unrelated multiple claims;" rather, Abrams asserted that the claims in Wahl were "interrelated" and "subject to a single retention." On February 3, 2009, Margulis responded by letter to Abrams and reiterated his position that Wahl involved unrelated claims subject to separate retentions. (*See* Transcript of the Testimony of Natalie G. Haag, page 74, line 20 through page 77, line 15; *see also* Exhibits 74 through 76.)

33. On or about March 3, 2009, BYA, through its counsel, Mr. Jamieson, entered into a Mutual Release and Settlement Agreement with the claimants in the Wahl Arbitration. BYA's portion of the settlement was $669,092.21, paid on March 27, 2009. BYA paid an additional $312,767.38 for fees and expenses related to the defense of the Wahl Arbitration. (*See* Doc. 152, page 13.)

34. Lloyds prorated the defense costs (attributing defense equally to each of the twenty-six claims in the Wahl Arbitration), and then paid only indemnity for each claim that exceeded the $50,000 "Each Claim" retention, for a total payment by Lloyds of $384,657.79 for defense and indemnity. (*See* Doc. 152, page 13.)

35. The total paid in defense and indemnity for the Wahl Arbitration was $1,366,517.38. After deducting the $384,657.79 paid by Lloyds, and one $50,000 "Each Claim"

8

Retention from the total incurred amount of $1,366,517.38, the net unreimbursed amount paid by BYA for defense and settlement of the Wahl Arbitration is $931,859.59. (*See* Doc. 152, pages 13-14.)

36. BYA sent a letter dated November 2, 2011, to Fireman's Fund proposing that the parties enter into a tolling agreement so that BYA could pursue coverage for the Wahl Claim under the Fireman's Fund policy in case coverage was not available under the Lloyds policy. (*See* Doc. 152, page 14; *see also* Exhibits 27 and 100.)

37. Both the Knotts and Colaner claims arose during the FFIC Policy period and were covered by Fireman's Fund, and Fireman's Fund imposed a $50,000 "Each Claim" deductible for each of the Colaner and Knotts claims. BYA satisfied the $50,000 "Each Claim" deductible imposed by Fireman's Fund for both the Colaner and Knotts claims, paying a total of $100,000 in deductibles for both claims. (*See* Doc. 152, pages 14-15.)

38. After payment of defense and indemnity for the Knotts and Colaner claims in excess of the "Each Claim" deductible, there would have been at least $1,365,416 of the $2 million "Each Claim" limits available under the FFIC Policy to pay defense and indemnity for the Wahl Arbitration. (*See* Doc. 152, page 15.)

39. BYA has no issue with the manner in which Mr. Jamieson defended the Knotts, Colaner, and Wahl claims. (*See* Doc. 165, page 5.)

40. BYA does not contend that Lloyds' representations caused it to instruct Mr. Jamieson to alter his defense strategies with regard to the Wahl claim. (*See* Doc. 165, page 5.)

41. Gerald C. Haake, an insurance broker expert retained by Lloyds, testified that it was unusual that CalSurance-Lancer Claims handled questions regarding coverage for Wahl both as to the FFIC Policy and the Lloyds' Policy. He also testified that CalSurance did not act as a

9

reasonable broker should have acted toward its insured, BYA, to the extent that it did not advise BYA to further pursue coverage of Wahl with FFIC. (*See* Transcript of the Testimony of Gerald C. Haake, page 78, line 19 through page 79, line 6; *see also* Exhibit 78.)

42. Lloyds took no action that changed or affected Mr. Jamieson's defense of the Wahl Arbitration. Rather, Mr. Jamieson defended Wahl just as he had defended Colaner and Knotts. (*See* Doc. 165, page 5.)

43. At the trial of the above-captioned case on February 25, 2015, Natalie Haag testified that it would have been more economically advantageous for BYA to pursue insurance coverage of the Wahl Arbitration with FFIC, as opposed to Lloyds, because the $50,000 deductible under the FFIC Policy had already been met.

44. Ms. Haag also testified at trial that, in the second half of 2008, she performed her own independent legal analysis of the claims in the Wahl Arbitration and concluded that they were not interrelated with one another. She testified that she "thought about" whether Wahl might be interrelated with Knotts and Colander but ultimately concluded that it was not interrelated to the earlier claims. Ms. Haag testified that her evaluation of whether the 26 Wahl claimants were interrelated involved the same type of legal analysis as her evaluation of whether Wahl was interrelated to Knotts and Colaner.

45. Ms. Haag testified at trial that, had BYA further pursued FFIC for coverage of the Wahl Arbitration in 2007, she does not know whether BYA would have actually been successful in getting coverage under the FFIC Policy.

## Proposed Conclusions of Law

1. New York law applies to the resolution of the substantive issues in this case. (*See* Doc. 79, page 2, section 3(d).)

2.      On August 9, 2013, the Tenth Circuit issued its mandate reversing this Court's entry of summary judgment in favor of BYA, and remanded for further proceedings. (*Brecek & Young Advisors, Inc. v. Lloyds of London Syndicate 2003*, 715 F.3d 1231, 1243 (10th Cir. 2013).)

3.      The Tenth Circuit held that the Wahl, Knotts and Colaner claims were all related, as "[s]everal common facts connect the Wahl, Knotts, and Colaner Arbitrations." Under the terms of both the Lloyds and Fireman's Fund policies, if the Knotts, Colaner and Wahl Claims are interrelated, they are to be treated as a single claim deemed to have arisen at the time of the first such claim. (*See id.* at 1238-39; *see also* Doc. 152, page 14.)

4.      "Because, applying the plain language of the [Lloyds] Policy, the Wahl, Knotts, and Colaner Arbitrations were connected by common facts, circumstances, decisions, and policies," the claims asserted in the Wahl Arbitration arose from wrongful acts interrelated to the wrongful acts committed outside, and before, the Lloyds policy period. As such, there is no coverage for Wahl under the Lloyds Policy. (*Brecek & Young Advisors, Inc.*, 715 F.3d at 1239.)

5.      The doctrine of equitable estoppel will apply under New York law where an insurer, "though in fact not obligated to provide coverage, without asserting policy defenses or reserving the privilege to do so, undertakes the defense of the case, in reliance on which the insured suffers the detriment of losing the right to control its own defense." In such circumstances, "though coverage as such does not exist, the insurer will not be heard to say so." *See Albert J. Schiff Assocs., Inc. v. Flack*, 51 N.Y.2d 692, 699 (N.Y. 1980).

6.      Estoppel "cannot be used to create coverage where none exists." (*See Federated Dep't Stores, Inc. v. Twin City Fire Ins.*, 28 A.D.3d 32, 38-39 (N.Y. App. Div. 2006); *see also Hartford*, 81 A.D.2d at 578 ("[a]n estoppel will lie only if the insured has been prejudiced by the insurer's actions").)

11

{0179330.DOCX}

7. A key element of common-law estoppel "is a showing by the insured of prejudice, or detrimental reliance." Further, "[w]here an insurer ultimately disclaims coverage and does so on a different ground than it initially identified to an insured, a reservation of rights as to other grounds precludes estoppel." (*See Tudor Ins. Co. v. First Advantage Litigation Consulting, LLC*, 2012 U.S. Dist. LEXIS 120178, at *38-9 (S.D.N.Y. August 21, 2012).)

8. "The purposed of a reservation of rights is to prevent an insured's detrimental reliance on the defense provided by the insurer. ***The reservation is a sufficient preventative to reliance even if the insurer later disclaims on a basis different from the ground originally asserted in the reservation of rights.***" (*See Federated*, 28 A.D.3d at 37-8 (emphasis added).)

9. Under New York substantive law, (1) estoppel "will lie *only* if the insured has demonstrated prejudice by the insurer's actions;" and (2) "[p]rejudice is established *only* where the insurer's control of the defense is such that the character and strategy of the lawsuit can no longer be altered." Logically, this means that, had the insured as opposed to the insurer been in control of the defense, the character and strategy of defending the lawsuit would have been altered and a different outcome reached. In other words, there can be no prejudice under New York law absent a showing by the insured that it would have handled the "character and strategy" of the defense differently than the insurer. (*See Federated*, 28 A.D.3d at 39 (emphasis added).)

10. Under New York law, prejudice or detrimental reliance alone is insufficient to recover damages from an insurer; reliance must also be "reasonable." (*See Hartford Accident & Indemnity Co. v. Regent Nursing Home*, 67 A.D.2d 935, 413 N.Y.S.2d 195 (1979) (despite finding detrimental reliance by insured, insured's reliance was "misplaced" and unreasonable).)

11. The party seeking to invoke the doctrine of equitable estoppel has the burden of proof on the issue of prejudice (or detrimental reliance). Here, to estop Lloyds from disclaiming

12

{0179330.DOCX}

coverage of Wahl, BYA must affirmatively prove detrimental reliance or prejudice as a result of Lloyds' actions. (*See* Doc. 152, page 23.)

12. The Tenth Circuit held that "the district court erred in concluding the defense of equitable estoppel was unavailable to BYA," and that BYA had made a sufficient showing of prejudice "as to Lloyds' attempt to recoup the approximately $385,000 it [had] already paid" because "at the time BYA settled the Wahl Arbitration Lloyds had expressly promised to provide coverage up to that amount." Under this holding, Lloyds is therefore estopped from disclaiming coverage of the Wahl Arbitration, but only as to the approximately $385,000 it already paid. (*Brecek & Young Advisors, Inc.*, 715 F.3d at 1243.)

13. The Tenth Circuit did not hold that Lloyds is estopped from raising the relation-back defense. (*See* Doc. 152, page 21.)

14. The Tenth Circuit held that "it does not necessarily follow that BYA is entitled to recover the same damages awarded by the district court on the (erroneous) basis that the Wahl claims did not relate back to the Knotts and Colaner claims." (*Brecek & Young Advisors, Inc.*, 715 F.3d at 1243.)

15. The Tenth Circuit further held that, "[i]n determining whether BYA is entitled to any additional recovery [beyond the approximately $385,000 already paid by Lloyds], however, the district court must consider the extent to which BYA detrimentally relied on Lloyds' representations, if at all." It also held that the Court "must consider whether Lloyds' erroneous representation that the twenty-six Wahl claims were not interrelated under the Policy negates any additional claim of detrimental reliance on the part of BYA." (*Brecek & Young Advisors, Inc.*, 715 F.3d at 1243.)

13

16.     This Court has concluded that "the mandate must be read *narrowly, and within the context of the New York law cited by the Court in its opinion.*" (*See* Doc. 152, page 21 (emphasis added).)

17.     Thus, on remand, there are only two narrow issues: (1) whether BYA detrimentally relied – and thereby suffered additional damages beyond the $385,000 already paid by Lloyds – on Lloyds' coverage counsel's opinion in November 2007 that the *Wahl* Arbitration was not interrelated with the *Colaner* claim; and (2) whether, at the time of settlement of the *Wahl* Arbitration, Lloyds' representation in December 2007 that the *Wahl* claimants were separate and distinct negates any additional detrimental reliance on the part of BYA. (*See* Doc. 152, pages 20-22.)

18.     However, in order for the Court to reach the second issue (negation of damages), BYA must satisfy the first issue by affirmatively proving that it reasonably and detrimentally relied to its prejudice on Lloyds' coverage counsel's November 2007 opinion, such that it is entitled to additional damages (i.e., those previously awarded by the district court). If BYA cannot meet its burden of proof in this regard, then Lloyds is not equitably estopped from disclaiming coverage of the Wahl Arbitration beyond the approximately $385,000 already paid and BYA is entitled to no further damages. (*See* Doc. 152, page 20-22.)

19.     For the following reasons, based upon the authorities cited above, the Court concludes that the evidence produced by BYA fails to satisfy BYA's burden of proof on its claim for additional damages, and as such, Lloyds is not estopped from disclaiming coverage of the Wahl Arbitration above and beyond the approximately $385,000 already paid by it to BYA:

14

a. Lloyds did not control the defense of the *Wahl* claim, but rather the defense was directed by plaintiff's in-house counsel, Natalie Haag, and by its insurance adjuster, Lancer Claims Services.

b. Even assuming, *arguendo*, that Lloyds controlled the defense of the *Wahl* claim, plaintiff suffered no damage from the manner in which the *Wahl* claim was defended. BYA has admitted that it "has no issue with the manner in which Jamieson defended the Wahl, Colaner or Knotts claims." Nor does BYA "contend that Lloyds' representations caused it to instruct Jamieson to alter his defense strategies with regard to Wahl."

c. Plaintiff tendered the defense of the *Wahl* claim to its insurer, Fireman's Fund Insurance Company on June 22, 2007. Fireman's Fund, however, never undertook any defense or indemnity of the *Wahl* claim. Plaintiff did not object to Fireman's Fund's position and took no steps to challenge that position. Nothing Lloyds did prevented plaintiff from seeking all of its rights under its Fireman's Fund policy.

d. Defendant made no misrepresentations to plaintiff regarding the *Wahl* claim or the interrelatedness of the *Wahl* claim to the *Colaner* and *Knotts* claims. Lancer retained independent counsel, Andrew Margulis, who rendered his opinion that the claims were not related. That this opinion has now been found by the Tenth Circuit to be incorrect does not mean that Mr. Margulis made a misrepresentation. Even if this were a misrepresentation, it was not made by defendant, but rather by independent counsel.

e. The *Wahl* claim was a "related claim" under Section V, paragraph G of the Fireman's Fund policy issued to BYA. The *Wahl* claim was properly tendered to Fireman's

15

Fund by sending it to Lancer Claims Services, Inc., as provided by condition IA1 of the policy.

  f. Plaintiff is a sophisticated company with its own in-house lawyers. Plaintiff also had experience with claims against its securities dealers and had a course of dealing with its broker, CalSurance, and with its insurance adjuster, Lancer Claims Services, both of which are subsidiaries of the same company, Brown & Brown of California, Inc. Nothing defendant did prevented plaintiff from working with its broker and adjuster in pursuing its rights under its Fireman's Fund policy.

  g. Based on the opinion of the Tenth Circuit, coverage was potentially available to plaintiff under its Fireman's Fund policy, since the *Wahl* claim was interrelated to the *Colaner* and *Knotts* claims.

  h. CalSurance/Lancer should have advised plaintiff to pursue its rights under the Fireman's Fund policy. That this did not occur is not the responsibility of defendant.

  i. Fireman's Fund also provided BYA with an opinion, and with a coverage denial, stating that the *Wahl* claim was not related to the *Colaner* and *Knotts* claims. Therefore, plaintiff was receiving the same information from its adjuster, from Fireman's Fund's outside counsel, and from defendant's outside counsel. Plaintiff cannot now claim that it was relying on one of these statements to its prejudice, but was not relying on the other two. This Court cannot find reasonable detrimental reliance on the part of BYA.

  j. At trial, Natalie Haag testified (1) that she did her own independent legal analysis in coming to the conclusion that the Wahl claimants were interrelated to one another but yet not interrelated to Knotts and Colander; and (2) that it would have been more economically advantageous for BYA to pursue coverage of the Wahl Arbitration

16

under the FFIC Policy since the $50,000 retention under this policy had already been met. Based upon Ms. Haag's testimony, any purported detrimental reliance on the part of BYA was simply not reasonable and Lloyds is therefore not liable.

  k. Ms. Haag testified at trial that, had BYA further pursued FFIC for coverage of the Wahl Arbitration in 2007, she does not know whether BYA would have actually been successful in getting coverage under the FFIC Policy. In fact, BYA adduced no evidence establishing that the Wahl Arbitration would have been covered under the FFIC Policy had BYA taken further steps to pursue coverage with FFIC. Thus, even assuming *arguendo* that BYA reasonably relied on Lancer's representations about Lloyds' coverage of the Wahl Arbitration, *it cannot, as a matter of law, be said that BYA relied to its detriment*. The core of BYA's detrimental reliance argument is that it would have pursued and received coverage for Wahl from FFIC had Lancer or Lloyds more timely informed it of the relation-back defense. But, based upon the evidence before this Court, it is speculation at best to say that FFIC would have covered Wahl and it is just as likely that FFIC would have persisted with the position outlined in its November 26, 2007 letter and continued to deny coverage of Wahl. On this basis, BYA's claim for *detrimental* reliance fails.

20. Because BYA has failed to prove any reasonable detrimental reliance on its claim for additional damages, this Court need not reach the issue of negation, the second issue on remand.

WHEREFORE, in summary, this Court finds that no coverage exists under the Lloyds Policy for BYA as to the Wahl claim, that BYA has failed to prove any reasonable detrimental reliance on its claim for additional damages beyond the approximately $385,000 already paid by Lloyds, and that BYA is thus not entitled to any such additional damages.

17

*Respectfully submitted:*

**NORRIS & KEPLINGER, LLC**

/s/*Christopher J. Lucas* #20160
Bruce Keplinger, bk@nkfirm.com  #09562
Christopher Lucas, cjl@nkfirm.com, #20160
9225 Indian Creek Parkway
Corporate Woods, Building 32, Suite 750
Overland Park, Kansas 66210
913.663.2000/Fax: 913.663.2006
**ATTORNEYS FOR DEFENDANT LLOYDS OF LONDON SYNDICATE 2003**

## CERTIFICATE OF SERVICE

I certify that on this 2nd day of March, 2015, the foregoing was filed using the CM/ECF system, which sent notice of electronic filing to the following:

Michael J. Abrams
Kimberly K. Winter
Lathrop & Gage, LLP-KC
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri  64108-2684
(816) 292-2000/(816) 292-2001 FAX
mabrams@lathropgage.com
kwinter@lathropgage.com
ATTORNEYS FOR PLAINTIFF BRECEK & YOUNG ADVISORS, INC.

/s/*Christopher J. Lucas*
Attorneys for Lloyds of London Syndicate 2003

{0179330.DOCX}